*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 04a0415p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

UNITED STATES OF AMERICA,

  *Plaintiff-Appellee,*

  *v.*

MICHAEL A. ROBINSON,

  *Defendant-Appellant.*

No. 02-5040

>

---

Appeal from the United States District Court
for the Eastern District of Tennessee at Knoxville.
No. 00-00129—James H. Jarvis, District Judge.

Argued: August 6, 2003

Decided and Filed: December 2, 2004

Before: BOGGS, Chief Judge; RYAN, Circuit Judge; and ROSEN, District Judge.[*]

---

## COUNSEL

**ARGUED:** Herbert S. Moncier, LAW OFFICES OF HERBERT S. MONCIER, Knoxville, Tennessee, for Appellant. David P. Folmar, Jr., ASSISTANT UNITED STATES ATTORNEY, Cleveland, Ohio, for Appellee. **ON BRIEF:** Herbert S. Moncier, LAW OFFICES OF HERBERT S. MONCIER, Knoxville, Tennessee, for Appellant. David P. Folmar, Jr., ASSISTANT UNITED STATES ATTORNEY, Cleveland, Ohio, for Appellee.

---

## OPINION

---

ROSEN, District Judge.

## I. *INTRODUCTION*

Defendant/Appellant Michael A. Robinson was charged in a six-count second superseding indictment with one count of conspiracy to distribute marijuana and cocaine (Count One), two counts of possession with intent to distribute marijuana (Counts Three and Six), two counts of carrying firearms during and in relation to the above-cited drug trafficking offenses (Counts Two and Five), and one count of being a felon in possession of a firearm (Count Four). Co-defendants Kawyn Logan, William Barnes, and Ronald Brady also were named in the Count One conspiracy charge, and Barnes was named in the

---

[*]The Honorable Gerald E. Rosen, United States District Judge for the Eastern District of Michigan, sitting by designation.

Count Six marijuana possession charge. Following a six-day trial of Defendant Robinson and Brady in June of 2001,[1] the jury returned guilty verdicts against Robinson on Counts One through Five and against Brady on the Count One conspiracy charge.[2] The jury further found that Robinson's role in the drug conspiracy offense involved both marijuana and cocaine, including at least five kilograms of cocaine and less than 50 kilograms of marijuana.[3]

After escaping from jail shortly after trial, Robinson was sentenced in absentia on November 27, 2001 to 292 months' imprisonment as to Count One, 60 months as to the Count Three marijuana possession offense, and 120 months as to the Count Four felon-in-possession offense, to be served concurrently. Robinson was also sentenced to 60 months imprisonment as to each of the "carrying" offenses (Counts Two and Five), to be served concurrently with each other but consecutively to the other portions of his sentence. He now appeals his conviction and sentence, challenging a number of the district court's pretrial determinations and rulings at trial, arguing that the evidence was insufficient to sustain four of the five counts of conviction, and claiming that the district court erred in sentencing him in absentia and in calculating his sentence. We affirm Robinson's conviction but remand for resentencing.

## II. *FACTUAL AND PROCEDURAL BACKGROUND*

**A.      The Facts Underlying Defendant's Suppression Motions in the District Court**

The charges against Defendant/Appellant Michael A. Robinson in this case — and the issues raised by Robinson on appeal — rest in significant part upon evidence uncovered in three searches and/or seizures conducted on May 19, 2000, June 15, 2000, and June 27, 2000. Because Robinson has challenged the district court's denial of his several motions to suppress this evidence, we describe each of these incidents in turn.

### 1.      The Controlled Delivery on May 19, 2000

On May 19, 2000, Robinson was arrested following a controlled delivery of a package at a Pak Mail facility in Morristown, Tennessee. The facts surrounding this incident derive primarily from the testimony of federal Postal Inspector Sam Romano and Detective Dan Cox and Inspector Randy Noe of the Morristown Police Department. According to Inspector Romano, upon a routine visit to the Knoxville, Tennessee Airport on May 19, 2000 to review incoming mail, he observed a package with a return address of Inglewood, California, that was being shipped to a "Healthy Hair Barber Shop" in Morristown.[4] Romano testified that several factors, including the smell of marijuana, a return address from a known drug distribution area, and handwritten labels, made him suspect the package. In addition, a preliminary investigation revealed that the return address was a private residence.

Accordingly, Inspector Romano took the package back to his office, where he contacted the Knox County Sheriff's Department and requested the assistance of a drug-sniffing dog. Romano then placed the package in a line-up with four others, and the drug dog, Blec, positively alerted to the suspect package. After applying for and obtaining a federal search warrant, Romano opened the package and discovered 13

---

[1] Logan pled guilty to the Count One conspiracy charge, and another defendant, Daniel McGill III, also pled guilty to a marijuana conspiracy offense.

[2] The district court dismissed the Count Six marijuana possession charge at the close of proofs at trial, as well as the cocaine portion of the Count One conspiracy charge as to Brady.

[3] Brady likewise was held responsible for less than 50 kilograms of marijuana.

[4] The mailing address for this establishment was Box 115 at the Pak Mail facility. This box was registered to "Kelly Banks," an alias used by an acquaintance of Defendant Robinson, Dena Carmichael.

round cabbage-sized balls, weighing almost 14 pounds in total and testing positive for marijuana. Romano then contacted federal Drug Enforcement Agency ("DEA") agents and the Morristown Police Department to begin preparations for a controlled delivery of the package at the Morristown Pak Mail facility.

An investigation conducted in advance of the controlled delivery suggested a link between the package and a maroon or dark red Ford Ranger pickup truck. Soon after their arrival at the mail facility, officers noticed a maroon Ford Explorer with two male occupants driving slowly past vehicles in the parking lot, pausing, and apparently looking into the parked cars. Eventually, the driver dropped the passenger off at a group of stores near the Pak Mail facility, and then parked the vehicle, entered the Pak Mail facility, and exited with the package. The package was signed for by "Derrick Palmer," an authorized recipient of packages at Box 115.

After this individual, later identified as Robinson, exited the Pak Mail facility, Inspector Romano[5] approached him and placed him under arrest when he returned to within 30 to 50 feet of his vehicle. Romano testified that he then conducted a brief survey of the vehicle for any other people who might have been hiding inside, or for any weapons that could be easily reached. Inside the vehicle, Romano spotted a long, narrow box labeled as containing a shotgun, as well as a black backpack. Upon opening the box, Romano discovered a 12-gauge shotgun with the barrel removed from the receiver.[6] A subsequent inventory search of the vehicle at the Morristown Police Department recorded the shotgun, shotgun ammunition, a 9mm semi-automatic pistol and a loaded ammunition clip in the black backpack, and a variety of other items, many of which referenced Robinson's "Derrick Palmer" alias.

Inspector Romano acknowledged at trial that the search warrant he had obtained before opening the package did not explicitly provide authorization to conduct a controlled delivery. He and Detective Cox both testified, however, that the package remained within the constructive custody of Detective Cox at all times. Cox testified that he stayed inside the Pak Mail facility with the package, and was no more than 10-15 yards away from the package at all times prior to its delivery to Robinson.

After Robinson and McGill were arrested, a woman later identified as Dena Carmichael phoned the Pak Mail facility, claiming to be Kelly Banks (in whose name the mailbox was registered), and seeking to determine whether a package had arrived. Upon attempting to retrieve the package later that day, she was told by a clerk at the facility that the package already had been retrieved.

### 2.    The Controlled Delivery of a UPS Package on June 15, 2000

On June 15, 2000, federal and local law enforcement officers carried out a controlled delivery of a UPS overnight package addressed to "J.B. Evans" in Knoxville, Tennessee. The facts surrounding this incident derive primarily from the testimony of DEA Agent Stephen Ribolla, Knoxville Police Officer Kenneth Gilreath, and Allen Steele of UPS. Agent Ribolla received a phone call on June 14, 2000 from a California Highway Patrol officer, and learned that a drug-sniffing dog had alerted to a UPS overnight package being shipped out of the Los Angeles International Airport to Knoxville. Agent Ribolla contacted Allen Steele, a security representative at UPS in Knoxville, and advised him that the box would be arriving at his facility the following morning.

Steele testified that he informed Agent Ribolla, pursuant to UPS policy, that a warrant or subpoena was necessary before the company would relinquish the package. As Ribolla prepared to obtain a warrant, Steele opened the package himself, again in accordance with UPS policy, and discovered what he believed

---

[5] The vehicle's other occupant also was arrested. He identified himself as James Evans and had false identification bearing that name, but was later identified as Daniel McGill.

[6] On cross-examination at trial, Romano could not recall whether he opened the box at the scene or later at the Morristown Police Department.

to be marijuana.[7]  Based on this information, Ribolla took the package, notified the Knoxville police, and began preparations for a controlled delivery at the package's delivery address, a Mailboxes, Etc. store located on Cedar Bluff Road in Knoxville.[8]

Agent Ribolla, Knoxville Police Officer Gilreath, and other officers traveled to this location on the morning of June 15, 2000 and waited for someone to claim the overnight package.  At around 10:00 a.m., a white Toyota Camry with two occupants arrived at the store, and an individual emerged from the passenger side of the car, picked up the package, and returned to the vehicle.  As the Camry left the scene, Agent Ribolla, Officer Gilreath, and another Knoxville police officer followed in a police van.

A short time later, following a U-turn, the Camry's driver evidently realized that he was being followed and a high-speed chase ensued, ending when the Camry drove through a residential yard and into a creek embankment.  Two men jumped out of the vehicle and ran into the woods.  Officer Gilreath was able to catch the car's passenger, who initially identified himself as Paul Bails, but later gave the name of James Evans.  Through fingerprints, this individual eventually was identified as Daniel McGill.  The vehicle's driver evaded capture.

Upon searching the Camry, Agent Ribolla and the Knoxville police officers found two boxes in the trunk:  the package used in the controlled delivery, and another package picked up a short time earlier from a different Mailboxes, Etc. store located on Morrell Road in Knoxville.[9]  Both boxes contained large blocks of compressed marijuana, an outer wrapper coated in a mustard-like substance, and additional saran wrap.  An investigation revealed that the Camry had been rented by Derrick Palmer, an alias used by Defendant Robinson.  Although Agent Ribolla initially suspected that Robinson was the driver of the vehicle, he later determined, and McGill confirmed at trial, that the driver was William Barnes.[10]

### 3.      The Search and Seizure of a Package on June 27, 2000

In light of the discovery that mailboxes in the Knoxville area apparently were being rented under aliases and used to receive marijuana shipments, law enforcement officers began canvassing local mailbox rental facilities to identify rentals under the known aliases of Derrick Palmer, James Evans, and Samuel Thompson.[11]  This investigation revealed that a mailbox had been rented under the name of Samuel Thompson at a Mailboxes, Etc. store on Kingston Pike in Knoxville.  Agent Ribolla visited this location on June 27, 2000, and learned from the store manager that a Federal Express package addressed to Samuel Thompson's mailbox had been delivered a month or two earlier, but had not yet been picked up and remained at the facility.[12]

---

[7]Steele testified that Agent Ribolla did not ask or otherwise encourage him to open the package.

[8]The package was addressed to a mailbox at this facility that had been opened in the name of James Evans.

[9]This second package was addressed to co-defendant William Barnes.

[10]Although Robinson apparently had rented the Camry, Daniel McGill testified at trial that Robinson withdrew from the agreement with McGill and Barnes as of his arrest on May 19, 2000.  McGill testified that Robinson had left for California to attend his grandfather's funeral sometime prior to June 15, 2000, and airline records appear to confirm this.  McGill further testified that Robinson was not involved in the June 15 transaction, and that he had previously requested that McGill and Barnes return the Camry to the rental car agency.

[11]Dena Carmichael testified at trial that she had seen a false identification card with Robinson's picture and the name of Samuel Thompson.

[12]The label indicated that this package had been sent by "Tommy Lane and the Pulse" in Los Angeles, California to "World Records" at "Suite 311" of the Mailboxes, Etc. location on Kingston Pike in Knoxville.  Box 311 at this facility had been rented by Samuel Thompson, and "World Records" had been used as the company name on at least one other mailbox rented at a

Agent Ribolla testified that the box smelled strongly of marijuana. Accordingly, he and Postal Inspector Romano sought a search warrant to open the Fed Ex package. In an affidavit submitted in support of this request, Inspector Romano indicated that the package had been placed in a five-package line-up and that a drug-sniffing dog, Taz, had positively alerted to the Fed Ex package. The affidavit further stated that the Fed Ex package had been turned over to law enforcement as abandoned property.[13]

A federal magistrate issued the requested warrant, and the box was then opened. Inside, agents found compressed marijuana, packaged into approximately twelve round balls, weighing a total of ten to fifteen pounds. Agent Ribolla testified that this packaging was almost identical to the packaging used in the box seized in Morristown on May 19, 2000.

## B.     The Trial Testimony of and Concerning Robinson's Co-Conspirators

Much of the remaining evidence introduced by the government at trial concerned Defendant Robinson's relationships and transactions with his alleged co-conspirators. One of these alleged co-conspirators, co-defendant Daniel McGill, was called as a government witness, as was one of Robinson's acquaintances, Dena Carmichael, who testified that she introduced Robinson to co-defendant Ronald Brady and was otherwise familiar with Robinson's activities. We summarize this evidence here, with more detail to follow as necessary to our analysis of the issues presented on appeal.

### 1.     Daniel McGill

Daniel McGill first met John Robinson, Defendant's brother, in Los Angeles sometime in 1994 or 1995, and he met Defendant in California in 1995. In approximately April of 2000, McGill moved to Knoxville, Tennessee, upon John Robinson's suggestion that he work with Defendant picking up packages and doing odd jobs for Defendant's uncle.

McGill could not recall at trial when he first opened a mailbox at Mailboxes, Etc., but he testified that he was involved in picking up packages as early as April or May of 2000. Indeed, even prior to his arrival in Tennessee, McGill testified that he was aware of Defendant's involvement in picking up packages, and that some of these packages may have contained marijuana. As part of this scheme, he and Defendant acquired false identification, with McGill making passport photos and Defendant sending them off for preparation. McGill then used this identification to open mailboxes at three different Mailboxes, Etc. locations.

McGill testified that, after obtaining these mailboxes, he and Defendant discussed a source of marijuana. According to McGill, Defendant told him he could make money by simply picking up packages of marijuana when they arrived, provided that a source could be arranged. McGill suggested co-defendant William Barnes, who he knew from North Carolina during the late 1980's. McGill contacted Barnes, who arranged for delivery to the mailboxes he and Defendant had rented. For picking up the arriving packages, which averaged fifteen pounds each, McGill was paid approximately $600 per week by Robinson and

_____

different Mailboxes, Etc. location by an individual who identified himself as "James Evans." (*See* Trial Ex. G31, Mailboxes, Etc. Records, J.A. at 1344.)

**13**This affidavit also cited the May 19 and June 15, 2000 incidents as further grounds for Inspector Romano's belief that the Fed Ex package contained controlled substances. The claimed relevance of these incidents, however, rested upon Inspector Romano's assertion in his affidavit that the Fed Ex package had been sent to a mailbox opened in the name of James Evans. As noted, the mailbox actually was held in the name of Samuel Thompson, and the affidavit in support of the search warrant did not suggest any possible link between this individual and the earlier incidents.

Barnes.[14] McGill also testified that, at Barnes's direction, he wired approximately $5000-$7000 a week to California to pay the source. To pick up the packages, McGill used rental cars provided by Robinson.

McGill testified on cross examination that, as of Defendant's arrest following the controlled delivery on May 19, 2000, his "business" relationship with Defendant ceased, though he continued to work with Barnes. When asked whether he participated in any transactions with Robinson's girlfriend, Dena Carmichael, McGill testified that his dealings were solely with Robinson, and that, "as far as if he was in agreement with anyone else, I chose not to be — not to know about it." (J.A. at 702.)

### 2.      Dena Carmichael

Dena Carmichael met Defendant Robinson in the summer of 1999, and the two subsequently began to date. Carmichael testified that she would often stay at Robinson's home while he was traveling, and each time Robinson would leave her from $300 to $500 to pay bills and other living expenses.

After approximately six months, in late 1999 or early 2000, Carmichael testified that she became aware that Robinson was involved in illegal activities.[15] Carmichael discovered a number of false identification documents bearing names such as "Samuel Thompson" and "Derrick Palmer." Carmichael testified that she also secured false identification for herself, under the name "Kelly Banks." At Robinson's request, she used this false identification to open mailboxes, including a Pak Mail mailbox in Morristown that she opened on May 17, 2000. The mail service application for this box authorized receipt of packages by "Derrick Palmer." In addition, Robinson asked at some point whether Carmichael knew of anyone who might be interested in purchasing marijuana, and she introduced him to co-defendant Ronald "Bunky" Brady.

Carmichael testified that, approximately four months prior to Robinson's arrest on May 19, 2000, she accompanied him to pick up Fed Ex envelopes containing identification and cash. The Fed Ex envelopes originated in California, and were sent to a Mailboxes, Etc. facility in Knoxville. On one occasion, in approximately January of 2000, Carmichael accompanied Defendant when he picked up a package approximately two feet tall by two feet wide — of similar size to those in evidence. When the package was opened at Robinson's home, Carmichael observed one brick of pressed marijuana, wrapped and covered in Vick's VapoRub to mask the smell, and Robinson told her that the brick was a pound of compressed marijuana.

Carmichael testified that she observed Robinson counting large amounts of cash in his home, and that she occasionally assisted in this task.[16] Robinson gave Carmichael large sums of money to buy home furnishings and to pay bills, and bought her shoes and clothing. In addition, Carmichael occasionally accompanied Robinson to banks to withdraw funds. At one bank, Carmichael opened an account under a false name, and withdrew $10,000 from a separate account. At another bank, Carmichael withdrew funds totaling $5,000 from an account under a false name. The money from both accounts was turned over to Robinson.

---

[14]McGill conceded on cross examination that, upon initial questioning by the police, he had mentioned only Barnes and not Defendant as his source of payment.

[15]Robinson challenged this claim on cross-examination, citing evidence that he and Carmichael seemingly were not even together during this period — Robinson apparently was in California in late 1999 and early 2000. More generally, cross examination revealed a number of inconsistencies in Carmichael's testimony regarding her whereabouts at various times and the dates that she and Robinson traveled to California during this period.

[16]As revealed during Carmichael's cross-examination, she testified before the grand jury that she first observed money being counted in May of 1999, but her trial testimony indicated that she did not meet Robinson until June of 1999.

Carmichael testified that she was aware of a Fed Ex account Robinson held in 1999 under the name "World Records." Robinson, according to Carmichael, was a writer and singer, and was using this account to conduct business with locations in California. Carmichael also had a Fed Ex account under the name "LeFeme Boutique," which was the name of the hair salon where she worked when she originally moved back to Tennessee. Carmichael testified that co-defendant Kawyn Logan and others used her account, and Federal Express billing records disclosed numerous packages sent by various senders, including Derrick Palmer and Logan.[17] These packages were sent to various Tennessee and California addresses, with the most frequent recipient being "New Breed Entertainment."[18] Of the packages sent via this Fed Ex account, Carmichael admitted to personally sending a package on May 17, 2000 to Tiana Salgado, Robinson's girlfriend in Los Angeles. The package contained baby clothes, as well as a picture of Carmichael to be used to obtain false identification so that she could open additional mailboxes to receive marijuana shipments.

Carmichael further testified that, at Robinson's request, she purchased a handgun from a gun shop in Morristown. Robinson purportedly used Carmichael to purchase the gun, as he could not do so himself due to his criminal record. In addition to the handgun, Carmichael testified that Robinson owned a rifle.

### 3.    Ronald Brady

Co-defendant Ronald "Bunky" Brady was introduced to Defendant Robinson in approximately May of 2000 by Dena Carmichael, in response to Robinson's query whether Carmichael knew of anyone who might be interested in buying marijuana from him. Carmichael testified that, following an initial meeting between Robinson and Brady, she spoke with both men on a daily basis, and often facilitated contacts between them. In exchange for making this introduction, Carmichael was given a share of the proceeds from Robinson's first few deals with Brady. According to Carmichael, Brady told her that Robinson was "a good guy to deal with, meaning dealing with drugs." (J.A. at 780.)

### 4.    Kawyn Logan

According to Dena Carmichael, co-defendant Kawyn Logan was an old friend and schoolmate of Defendant Robinson. Carmichael was introduced to Logan at Robinson's home in late 1999. Carmichael testified that she did not personally observe Logan engaged in the distribution of drugs, but she stated that Logan would not talk in her presence, and that if he had anything of import to say, he would pull Robinson aside. Whenever Carmichael was present, Logan would tell Robinson that she "wasn't to be trusted."

Carmichael testified that she observed Logan and Robinson counting money, in her estimate between $20,000 and $35,000, in a back room of Robinson's home. In addition, Carmichael testified that she overheard Robinson and Logan speaking about drugs over the phone, beginning in early 2000. The phone conversations, according to Carmichael, made reference to "green" and "trees" (meaning marijuana) and "white" (meaning cocaine).

Logan rented a post office box from a location on Sanderson in Knoxville. In July of 1999, a package destined for this box was intercepted at Los Angeles International Airport and found to contain approximately one kilogram of cocaine. Upon further investigation, it was determined that a series of

---

[17]In defense counsel's questioning of Agent Ribolla, it emerged that these and other records indicated that Robinson had used Carmichael's and other mail accounts at times when he arguably was unavailable, including in the days immediately following his May 19, 2000 arrest, during a period in June of 2000 when he apparently was in California, and in late October of 2000 when he was being held in Blount County Jail.

[18]Carmichael testified that the name "New Breed Entertainment" was a false company name created by Robinson and his friends. She recognized another of the recipient addresses as the same one she and Robinson had used to obtain false identification. Other recipient addresses corresponded with Robinson's residence in Athens, Tennessee, and the LeFeme Boutique salon where Carmichael had worked in Morristown.

packages were received at this post office box and signed for by Logan between April and July of 1999. Thus, well before Robinson's May 19, 2000 arrest, Postal Inspector Romano had accumulated a file of package labels addressed to Logan at this post office box in Knoxville. All of these labels were dated between April and July 29, 1999, addressed to or signed for by Logan, and delivered to Knoxville.[19] The date of the earliest such package, April 22, 1999, corresponds to the date alleged in the indictment as the beginning of the Count One conspiracy.

### 5.          William Barnes

The record contains very little evidence pertaining to co-defendant William Barnes. Daniel McGill testified that he identified Barnes to Defendant Robinson as someone who might have a source for marijuana, and that Barnes subsequently arranged for delivery to the mailboxes rented by McGill and Robinson. As noted earlier, McGill testified that he was paid by Robinson and Barnes to pick up packages, that he wired money to California weekly at Barnes's direction, and that, as of Robinson's arrest following the controlled delivery on May 19, 2000, his drug dealing relationship with Robinson ceased but he continued to work with Barnes.

Agent Ribolla provided some additional information as to Barnes's alleged involvement in the conspiracy. Upon investigation of the June 15, 2000 incident, it was determined that Barnes was the driver of the Toyota Camry involved in the high-speed chase that day.

## C.          Procedural Background

### 1.          Pretrial Proceedings

Defendant Robinson filed a series of pretrial motions in the district court, seeking to suppress (i) the contents of the package that purportedly was "seized" from a Mailboxes, Etc. location in Knoxville on June 27, 2000 before any warrant had issued,[20] (ii) the contents of an express mail package seized and searched pursuant to a warrant obtained on May 19, 2000, (iii) the contents of a UPS-shipped package seized and searched without a warrant on or about June 15, 2000, and (iv) firearms and other property seized without a warrant on May 19, 2000 from a maroon Ford Explorer in Morristown. Following an evidentiary hearing, Magistrate Judge Thomas W. Phillips recommended that these motions be denied, and the district court adopted this recommendation in an order filed on May 21, 2001.

In addition, on May 31, 2001, the district court conducted an evidentiary hearing on Defendant's challenge to the reliability of the two drug dogs, Blec and Taz, used in the May 19 and June 27, 2000 searches and seizures. In a Memorandum and Order issued June 5, 2001, the district court rejected this challenge, concluding that the dogs "were properly trained and reliable" and that their handlers "have been properly trained and certified." (6/5/2001 Memorandum and Order at 4, J.A. at 270.)

### 2.          Trial and Post-Trial Proceedings

A jury trial of Defendants Robinson and Brady was commenced on June 4, 2001 and concluded on June 18, 2001. During the trial, Robinson brought a number of motions, discussed below as pertinent to the issues on appeal. On June 20, 2001, the jury returned a guilty verdict against Robinson on Counts One

---

[19] Among other testimony about the various packages sent to Logan's post office box, Agent Ribolla noted that "Terry Bilson" was the sender of record on two packages sent to this box in June of 1999, and was also the sender of record on a package sent on July 5, 2000 to ANK Products in Knoxville using Dena Carmichael's Fed Ex account.

[20] Although a warrant was obtained authorizing the search of this package, Defendant argued that the package already had been illegally *seized* by the authorities before this warrant had issued.

through Five of the indictment, with Count Six having been dismissed during the trial by order of the district court.

As he awaited sentencing, Robinson escaped from federal custody at the Blount County Jail on July 12, 2001. The government sought to sentence him *in absentia,* but Robinson objected through counsel, arguing that this would violate his Fifth and Sixth Amendment rights. Defense counsel also filed a sentencing memorandum in the event that the district court elected to proceed with sentencing despite Robinson's absence.

At a hearing held on November 28 and 29, 2001, the district court elected to proceed in Robinson's absence, and sentenced him to a total of 352 months of imprisonment. Shortly thereafter, Robinson was apprehended in Brazil, and the government commenced extradition proceedings to secure his return to this country.[21] Robinson now appeals his conviction and sentence on a variety of grounds.

## III. *ANALYSIS*

Defendant Robinson has raised a wide array of challenges on appeal, involving every phase of the proceedings in the court below. Broadly speaking, the issues on appeal include: (i) challenges to pretrial rulings which, in Robinson's view, resulted in unfair surprise at trial; (ii) challenges to the district court's denial of Robinson's various motions to suppress evidence; (iii) claims that the evidence at trial was insufficient to support Robinson's convictions on Counts One, Two, Four, and Five; (iv) challenges to various evidentiary rulings during the trial; (v) claims of error in the jury instructions; and (vi) various challenges to the district court's rulings at sentencing. We address each of these issues in turn.

### A.     Defendant Was Not Prejudiced by the District Court's Pretrial Rulings.

As his first series of challenges on appeal, Defendant Robinson contends that the district court erred in pretrial rulings which (i) denied him a bill of particulars, (ii) denied him a pretrial ruling as to the precise nature, scope, duration and membership of the drug conspiracy charged in Count One of the indictment; (iii) failed to insist that the government provide him with proper notice of all evidence that arguably was subject to suppression, and (iv) denied him pretrial notice of the government's intent to offer evidence under Fed. R. Evid. 404(b). As a result of these alleged errors, Robinson maintains that he was "ambushed at trial." We do not agree.

#### 1.     The Denial of a Bill of Particulars

During the pretrial proceedings in the court below, Defendant Robinson sought but was denied a bill of particulars. Robinson claims that, as a result, he did not know (i) that the charged drug conspiracy involved cocaine, (ii) the temporal scope of the alleged conspiracy, or (iii) the acts which allegedly comprised this conspiracy. More generally, Robinson contends that a bill of particulars would have served to provide appropriate notice of the evidence the government intended to introduce at trial in support of the Count One drug conspiracy charge.

The decision whether to grant a motion for a bill of particulars lies within the district court's discretion, and this decision will not be overturned absent an abuse of discretion. *See United States v. Rey*, 923 F.2d 1217, 1222 (6th Cir. 1991). "Proof of abuse of discretion requires a showing of actual prejudice at trial and prejudice to the defendant's substantial rights by the denial." *Rey*, 923 F.2d at 1222 (internal

---

[21]In a submission filed shortly before oral argument, the government advised us that a Brazilian court has agreed to Robinson's extradition on the Count One and Count Three drug convictions, but not on the firearms convictions charged in Counts Two, Four, and Five of the indictment. This ruling apparently is in accordance with the terms of the extradition treaty between the United States and Brazil, which does not include firearms offenses among the list of convictions subject to extradition. Accordingly, in the event that we affirm the district court's judgment, the government asks that we order a limited remand for entry of an order conforming the terms of Robinson's incarceration to the Brazilian court's extradition ruling.

quotations and citations omitted).  Because the indictment was sufficiently detailed, and because Defendant has not specifically identified any actual prejudice he suffered, there was no abuse of discretion here.

The initial and superseding indictments uniformly charged Robinson with conspiracy to distribute both marijuana and cocaine, and they further alleged that this conspiracy commenced on or about April of 1999 and extended until at least August of 2000.  Next, while Robinson argues that a bill of particulars was necessary to his discovery of the identities of unindicted co-conspirators who the government planned to call as witnesses, the initial and superseding indictments identified nearly all of these individuals, with the exception only of Daniel McGill and Dena Carmichael.  As to McGill, however, he was arrested along with Robinson during the May 19, 2000 controlled delivery, which surely suggested the possibility that he might be called as a witness.  Similarly, Dena Carmichael lived at Robinson's house at times during the charged conspiracy, which again would tend to suggest that the government might seek her out as a witness.  Finally, Robinson has failed to point specifically to any actual prejudice he suffered at trial, but instead appears to more generally challenge a purported "routine practice" in the Eastern District of Tennessee to deny requests for bills of particulars.  Whatever the practice might be, the district court did not abuse its discretion by denying the request in this case.

### 2.       The Denial of a Pretrial Ruling Regarding the Admissibility of Co-Conspirator Statements

Robinson next maintains that the district court erred in failing to make a pretrial determination as to the admissibility of statements the government planned to offer under Fed. R. Evid. 801(d)(2)(E), which excludes co-conspirator statements from the definition of hearsay.[22]   As Robinson seemingly concedes, however, we have long recognized the trial court's prerogative to conditionally admit co-conspirator statements "subject to later demonstration of their admissibility by a preponderance of the evidence." *United States v. Vinson*, 606 F.2d 149, 153 (6th Cir. 1979).

Assuming, for the moment, that the district court was correct in its ultimate rulings as to the admissibility of co-conspirator statements under Rule 801(d)(2)(E) — a proposition which Robinson challenges, and which we address below — Robinson has not explained how he was prejudiced by the timing of this ruling.  In essence, he merely restates his complaint that he was not given sufficient pretrial notice of the government's evidence of conspiracy, and he suggests that a pretrial proceeding on the admissibility of co-conspirator statements would have provided such notice.  Be that as it may, we already have explained that Robinson was given sufficient pretrial notice of the nature, scope, and membership of the charged conspiracy.  Consequently, no "trial by ambush" occurred as a result of the district court's reservation of its Rule 801(d)(2)(E) evidentiary rulings until the close of the government's proofs.

### 3.       The Denial of Robinson's Pretrial Motion for Notice of Evidence Arguably Subject to Suppression

Pursuant to Fed. R. Crim. P. 12(d)(2),[23] Defendant Robinson brought a pretrial motion requesting notice of the prosecution's intent to use evidence arguably subject to suppression.  The district court denied this motion as moot, citing the government's assurance that it was unaware of any evidence arguably subject to suppression that Robinson was not already challenging.  On appeal, Robinson contends that this representation "turned out to be grossly incorrect as the government offered a plethora of records and mailing labels seized from private companies and cocaine in California."  (Appellant Br. at 30.)

---

[22]Specifically, Rule 801(d)(2)(E) provides that "a statement by a coconspirator of a party during the course and in furtherance of the conspiracy" is not hearsay.

[23]Rule 12 has since been amended, with the relevant language moved to subsection (b)(4).

Notably lacking from Robinson's argument on this point, however, is any suggestion of how the evidence in question might have been subject to suppression. The Rule 12 provision cited by Robinson is intended to ensure a meaningful opportunity to bring a motion to suppress, yet Robinson fails to argue either (i) that he lacked sufficient pretrial notice of the evidence in question or (ii) that this evidence would have been an appropriate subject of a suppression motion. In any event, as discussed below, we reject Robinson's contention that the district court erred in admitting evidence of activities outside of the Eastern District of Tennessee. Accordingly, Robinson suffered no prejudice as a result of the district court's ruling on this pretrial motion.

### 4.     The Claimed Lack of Notice of Rule 404(b) Evidence

Robinson next complains that the district court erred in denying as moot his motion for pretrial notice of the government's intent to offer "other acts" evidence under Fed. R. Evid. 404(b). Robinson claims that the trial court mistakenly accepted the government's characterization of this evidence as intrinsic to the conspiracy, and hence not within the scope of Rule 404(b). We believe, however, that this objection is more appropriately addressed in connection with Robinson's substantive challenges to the admission of various evidence at trial. Because the trial court generally held that the evidence in question was admissible as encompassed within the charged conspiracy, rather than under Rule 404(b), the issue of notice necessarily is intertwined with these evidentiary rulings.

### B.     The District Court Did Not Err in Denying Defendant's Various Pretrial Motions to Suppress Evidence.

Apart from these pretrial rulings, Defendant Robinson also appeals from the district court's denial of his several motions to suppress the evidence gathered as a result of the searches and seizures that occurred on May 19, 2000, June 15, 2000, and June 27, 2000. The lower court's factual findings on these matters are reviewed for clear error, but its determinations on legal issues, such as the existence of probable cause, are reviewed *de novo*. *United States v. Leake*, 998 F.2d 1359, 1362 (6th Cir. 1993). "A factual finding will only be clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'" *United States v. Ayen*, 997 F.2d 1150, 1152 (6th Cir. 1993) (internal quotations and citations omitted). We address each of the three challenged incidents in turn, and then consider Robinson's more general challenge to the drug-sniffing dogs used on these three occasions.

### 1.     The Controlled Delivery on May 19, 2000

Beginning with the May 19, 2000 controlled delivery at a Pak Mail facility in Morristown, Tennessee, Robinson contends that the evidence seized during this incident was tainted by three separate illegalities. First, he argues that, prior to making the controlled delivery at the mail facility, law enforcement agents illegally seized the subject package from the mail without a warrant or probable cause. We find, however, that this argument rests upon a flawed characterization of Postal Inspector Romano's initial actions upon encountering the subject package.

According to Inspector Romano's testimony, which was credited by the district court, he first observed the package during a routine visit to the Knoxville, Tennessee airport to review incoming mail. Several factors aroused his suspicion, including handwritten labels, a return address from a known drug distribution area, and the smell of marijuana. He also learned through investigation that the return address was a private residence. Based on these considerations, Inspector Romano transported the package to his office and placed it in a line-up with four other packages for examination by a drug-sniffing dog.

Although Robinson contends that Inspector Romano lacked the requisite warrant or probable cause to effect this "seizure" of the package,[24] the relevant case law establishes a different analytical framework for the situation presented here. Under analogous circumstances, we have held that the brief investigative detention and relocation of baggage so that it could be examined by a drug-sniffing dog did not constitute a search or seizure, where the luggage was not opened or otherwise "exposed to police or public view," and where this procedure "caused no meaningful interference with [the] defendant's possessory interest in [his] bag." *United States v. Gant*, 112 F.3d 239, 241 (6th Cir. 1997). The same is true here, where Inspector Romano did not open the package, and only temporarily diverted it from the ordinary delivery process.

More specifically, this and many other courts have found that only reasonable suspicion, and not probable cause, is necessary in order to briefly detain a package for further investigation, such as examination by a drug-sniffing dog. *See, e.g., United States v. Underwood*, 97 F.3d 1453, 1996 WL 536796, at *3 (6th Cir. Sept. 20, 1996); *United States v. Reid*, 67 F.3d 300, 1995 WL 579436, at *1-*2 (6th Cir. Sept. 28, 1995); *United States v. Terriques*, 319 F.3d 1051, 1056 (8th Cir. 2003); *United States v. Dennis*, 115 F.3d 524, 531-32 (7th Cir. 1997); *United States v. Banks*, 3 F.3d 399, 401-02 (11th Cir. 1993); *Daniel*, 982 F.2d at 149-50. In *Banks*, for instance, the Eleventh Circuit expressly held that "reasonable, temporary detention of a reasonably suspicious postal package prior to establishing probable cause for issuance of a search warrant for the time necessary to obtain a drug detection canine or otherwise conduct an investigation does not violate the Fourth Amendment." *Banks*, 3 F.3d at 403.

Robinson does not contend that Inspector Romano failed to meet this lesser standard of reasonable suspicion here. To the contrary, he seemingly concedes that Inspector Romano's detection of the odor of marijuana alone, if credited, would provide a sufficient basis for further investigation.[25] (*See* Appellant Br. at 35.) Nor does Robinson argue that the package was detained for an excessive period of time or in an otherwise unreasonable manner. Rather, the record indicates that only a few hours elapsed while Inspector Romano removed the package to his office, arranged for examination of the package by a drug-sniffing dog, and obtained a warrant to search the package. Accordingly, we find that this brief investigative detention of the subject package, based upon reasonable suspicion that it contained contraband, did not run afoul of the Fourth Amendment prohibition against unreasonable seizures.

Robinson next contends that the controlled delivery of this package somehow violated the Fourth Amendment or the terms of the search warrant obtained by Inspector Romano. Although his theory on this point is less than clear, Robinson evidently claims that the warrant obtained by Inspector Romano authorized only his initial search of the package — a search which, as noted earlier, revealed approximately 14 pounds of marijuana — and that a *second* warrant was needed in order to reclaim and reopen the package after it had been given to Robinson at the Pak Mail facility.

---

[24]As a threshold matter, we note that Robinson's challenge to this alleged "seizure" rests upon the premise that he had a legitimate expectation of privacy in the subject package, which was addressed to the "Healthy Hair Barber Shop" at a mailbox registered to "Kelly Banks." "Derrick Palmer," an alias used by Robinson, was listed as an authorized recipient of mail at this box, and Robinson used this name in picking up the package.

It is a familiar principle, of course, that "Fourth Amendment rights are personal . . . [and] may not be vicariously asserted." *Rakas v. Illinois*, 439 U.S. 128, 134-35, 99 S. Ct. 421, 425 (1978) (internal quotations and citations omitted). This has led some courts to question the extent to which a defendant can claim a reasonable expectation of privacy in a package addressed to a fictitious name. *See United States v. Daniel*, 982 F.2d 146, 149 & nn. 2-3 (5th Cir. 1993); *United States v. Lewis*, 738 F.2d 916, 919-20 n. 2 (8th Cir. 1984). The Eighth Circuit has observed, for example, that "[a] mailbox bearing a false name with a false address and used only to receive fraudulently obtained mailings does not merit an expectation of privacy that society is prepared to recognize as reasonable." *Lewis*, 738 F.2d at 919-20 n.2. We decline to reach this issue, however, as it has not been raised by the parties or addressed in the court below.

[25]Robinson questions the veracity of this claim, where Inspector Romano did not mention this smell in his application for a search warrant. Again, however, the district court credited this testimony, and we find no basis to disturb this credibility finding.

This argument, however, runs directly afoul of *Illinois v. Andreas*, 463 U.S. 765, 773, 103 S. Ct. 3319, 3325 (1983), in which the Supreme Court approved an analogous controlled delivery of narcotics, holding that "absent a substantial likelihood that the contents have been changed, there is no legitimate expectation of privacy in the contents of a container previously opened under lawful authority." Once officers have lawfully opened a container and found contraband inside, "[t]he simple act of resealing the container to enable the police to make a controlled delivery does not operate to revive or restore the lawfully invaded privacy rights." *Andreas*, 463 U.S. at 771, 103 S. Ct. at 3324. Robinson has not cited any authority for his contrary position. Nor has he identified any evidentiary basis for suspecting that the contents of the package might have been altered, where the officers testified that the package remained within their constructive possession at all times until Robinson claimed it, and where he was arrested immediately thereafter as he exited the Pak Mail facility with the package.

Finally, Robinson contends that the officers illegally searched the maroon Ford Explorer in which he had arrived at the mail facility. This challenge rests in part upon the claim, which we have already rejected, that this search was the product of an unlawful search and/or seizure of the package. Robinson further contends that he was at least 30 feet away from the vehicle at the time of his arrest, so that there was no threat that he might retrieve a weapon from the car.[26] We have upheld the search of an automobile incident to an arrest, however, even when the arrestee was out of the car, handcuffed, and placed in the back seat of a police cruiser. *See United States v. White*, 871 F.2d 41, 43-44 (6th Cir. 1989).[27] In any event, the record indicates that an inventory search would have been conducted in accordance with written police policy, so that the contents of the vehicle would be admissible under the doctrine of inevitable discovery. *See United States v. Kimes*, 246 F.3d 800, 804 (6th Cir. 2001). We find no error, therefore, in the district court's denial of Robinson's motion to suppress the evidence obtained during the May 19, 2000 controlled delivery.

## 2.     The June 15, 2000 Search and Seizure of a UPS Package

Defendant Robinson mounts a single and rather cursory challenge to the June 15, 2000 search and seizure of a package at a UPS facility in Knoxville, Tennessee. Specifically, he contends, without citation to any authority, that this package could not be opened or seized without a warrant, notwithstanding the fact that the package was opened by a UPS employee and not a law enforcement officer. This argument, however, runs counter to the evidentiary record and the controlling precedents.[28]

"[T]he Fourth Amendment proscribes only governmental action and does not apply to a search or seizure, even an unreasonable one, conducted by a private individual not acting as an agent of the government." *United States v. Lambert*, 771 F.2d 83, 89 (6th Cir. 1985). Moreover, "[a] person will not be acting as a police agent merely because there was some antecedent contact between that person and the police." *Lambert*, 771 F.2d at 89. Rather, to trigger Fourth Amendment protection under an agency theory, "the police must have instigated, encouraged, or participated in the search," and "the individual must have engaged in the search with the intent of assisting the police in their investigative efforts." 771 F.2d at 89. Regarding this requirement of intent, we have held that a private individual does not act as a government

---

[26]This ignores the possibility that someone else might have remained inside the car, a risk cited by Inspector Romano as a basis for his brief survey of the vehicle. This quick look, in turn, revealed a box labeled as containing a shotgun.

[27]We later limited *White* to situations where "the police remove the defendant from the vehicle," as opposed to circumstances in which an arrestee already has left his vehicle at the time he is approached and apprehended by the police. *See United States v. Strahan*, 984 F.2d 155, 159 (6th Cir. 1993). The Supreme Court recently rejected this distinction, however, holding that a search of an automobile incident to an arrest is permissible "even when an officer does not make contact until the person arrested has left the vehicle." *Thornton v. United States*, 124 S. Ct. 2127, 2129 (2004).

[28]We also question, once again, whether Robinson could claim a legitimate expectation of privacy in a package addressed to "J.B. Evans," an alias used by Daniel McGill.

agent where "the intent of the private party conducting the search is entirely independent of the government's intent to collect evidence for use in a criminal prosecution." *United States v. Howard*, 752 F.2d 220, 227 (6th Cir.), *vacated on other grounds,* 770 F.2d 57 (6th Cir. 1985); *see also United States v. Foley*, 23 F.3d 408, 1994 WL 144445, at *2 (6th Cir. Apr. 21, 1994) ("[I]f the intent of the private party conducting the search is independent of the official desire to collect evidence in a criminal proceeding, then the private party is not acting as a state agent.").

In his cursory presentation of this issue, Robinson has not endeavored to explain why the UPS employee who opened the subject package, Allen Steele, should be viewed as a government agent under the standards set forth in *Lambert* and our other precedents. Rather, Steele testified that he opened the package pursuant to UPS policy, and that DEA Agent Ribolla neither asked nor otherwise encouraged him to open it. Indeed, the district court explicitly found that "there is absolutely no evidence of record in this case that Mr. Steele was working as an agent for Agent Ribolla" when he opened the package, and that "the sworn testimony of record, and the only testimony elicited during the evidentiary hearing, refutes this assertion." (2/16/2001 Report and Recommendation at 32, J.A. at 70.) Robinson has not suggested a basis for questioning this factual finding, much less concluding that it is clearly erroneous. It follows, as the district court correctly held, that DEA Agent Ribolla was entitled to use the information gleaned in Steele's private search of the package — specifically, Steele's discovery of what he believed to be marijuana — without running afoul of the Fourth Amendment. *See United States v. Jacobsen*, 466 U.S. 109, 117, 119-20, 104 S. Ct. 1652, 1658-60 (1984); *United States v. Morgan*, 744 F.2d 1215, 1218 (6th Cir. 1985).

Moreover, this information supplied by Steele, combined with Agent Ribolla's confirming inspection of the contents of the already-opened package and the alert by the drug-sniffing dog before the package was shipped out of Los Angeles, provided ample grounds for a reasonable suspicion of illegal activity — and, undoubtedly, probable cause as well. For the reasons discussed earlier, this reasonable suspicion, in turn, allowed Agent Ribolla to detain the package temporarily without a warrant while he arranged for a controlled delivery. Alternatively, law enforcement officers were operating under exigent circumstances which, when combined with probable cause, would excuse the lack of a warrant, where the package was scheduled for overnight delivery and the officers had only a short time in which to prepare for a controlled delivery before the recipient might arrive to claim the package.[29] *See Morgan*, 744 F.2d at 1221-22. Accordingly, we find that the district court properly upheld the June 15, 2000 search and seizure of the UPS package addressed to "J.B. Evans."

### 3.          The June 27, 2000 Seizure of a Federal Express Package

Defendant Robinson next argues — once again, in perfunctory fashion and without citation to any authority — that federal agents acted unlawfully on June 27, 2000 by seizing a Federal Express package from a Mailboxes, Etc. store in Knoxville without first securing a warrant. We find this challenge lacking in merit, on two independent grounds.

The agents arrived at this Mailboxes, Etc. facility as a result of their investigation into mailboxes rented under the aliases of Derrick Palmer, James Evans, and Samuel Thompson. This inquiry revealed that a mailbox at the Knoxville store had been rented under the name of Samuel Thompson, and that a Federal Express package addressed to this mailbox had been delivered a month or two earlier but had not yet been claimed.[30] A store employee produced the package to the agents, and Agent Ribolla testified that it smelled strongly of marijuana. Accordingly, the agents placed the Fed Ex package in a five-package line-up, and

---

[29] In fact, the record reflects that the package was picked up at around 10:00 a.m. on June 15, the same morning it had arrived at the UPS facility in Knoxville.

[30] We again note, but decline to resolve, the question whether Robinson had a legitimate expectation of privacy in a package addressed to "World Records" at a mailbox rented in the name of "Samuel Thompson."

a drug-sniffing dog positively alerted to the package. Armed with this information, the agents sought and obtained a search warrant, and discovered ten to fifteen pounds of marijuana in the Fed Ex package.

The agents' actions prior to obtaining a warrant fit comfortably within the "reasonable suspicion" rubric discussed earlier. Through their investigation, the agents had learned that the alias "Samuel Thompson" had been used to rent mailboxes used in illegal drug trafficking. This information, in turn, led to the discovery of the subject Fed Ex package addressed to a mailbox held by Samuel Thompson at a Mailboxes, Etc. location in Knoxville. When this package was shown to the agents, a strong odor of marijuana was detected. All of this surely gave rise to a reasonable suspicion that justified the temporary detention of the package for examination by a drug-sniffing dog. When the dog positively alerted to the package, the agents sought and obtained a search warrant before opening the package. We conclude, therefore, that the agents' brief seizure of the Fed Ex package before obtaining a warrant was properly based upon a reasonable suspicion that the package might contain contraband.

Alternatively, the Fed Ex package could properly be characterized as abandoned, so that Robinson cannot challenge its seizure by federal agents. The Mailboxes, Etc. store manager testified that the rental agreement on Samuel Thompson's mailbox had lapsed at the time the subject package was delivered. The record also includes a standard Mailboxes, Etc. service agreement providing that packages sent to an expired mailbox "may be discarded or destroyed" after 30 days if the customer fails to make arrangements for forwarding, (*see* Mailboxes, Etc. Service Agreement at ¶ 6(c), J.A. at 1349), and there is no dispute that the subject package had been delivered to the Knoxville store more than 30 days before the agents seized it.

For Fourth Amendment purposes, the notion of "abandonment" turns upon whether a person can claim a continuing, legitimate expectation of privacy in the item at issue. *See United States v. Tolbert*, 692 F.2d 1041, 1044 (6th Cir. 1982). If property has been "abandoned" in this sense, the Fourth Amendment is not violated through the search or seizure of this property. *Tolbert*, 692 F.2d at 1044-45. We readily conclude that Robinson can claim no legitimate expectation of privacy in the Fed Ex package seized on June 27, 2000, but that this package instead was abandoned, because it was delivered to a expired mailbox and was subject to disposal or destruction by the time the agents seized it. If the package could have been thrown out at any time beyond the 30-day limit, we fail to see how Robinson could reasonably have expected its contents to remain private beyond this point. Accordingly, we find that the district court properly denied Robinson's motion to suppress the evidence obtained during the June 27, 2000 search and seizure.

### 4.       The Government's Use of Drug Detection Dogs

In each of the above instances, law enforcement officers used drug-sniffing dogs as part of their investigative efforts. In the case of the May 19 and June 27, 2000 searches and seizures, positive dog alerts were cited as a basis for procuring a warrant.[31] As his next challenge on appeal, Robinson argues that these drug-sniffing canines were not sufficiently trained and reliable to establish probable cause to believe that controlled substances were present in the subject packages.

"A positive indication by a properly-trained dog is sufficient to establish probable cause for the presence of a controlled substance." *United States v. Diaz*, 25 F.3d 392, 393-94 (6th Cir. 1994). To support such a probable cause determination, "the training and reliability of the dog must be established." *Diaz*, 25 F.3d at 394. Here, the district court expressly held that the three drug dogs challenged by Robinson "were properly trained and reliable," and that their handlers likewise "have been properly trained and certified." (6/5/2001 Memorandum and Order at 4, J.A. at 270.) We must uphold these factual determinations unless

---

[31] A drug-sniffing dog also was involved in the June 15, 2000 search and seizure, with this investigation having been triggered by a drug dog's positive alert to a UPS package as it was being shipped out of Los Angeles. Robinson does not challenge this use of a drug-sniffing dog, however. In any event, this alert was rendered largely inconsequential by the subsequent decision of a UPS employee to open the package, and by his discovery that the package apparently contained marijuana.

the district court's "findings as to [the dogs'] training and reliability are clearly erroneous." *Diaz*, 25 F.3d at 394.

Notwithstanding Robinson's various critiques of the methods used to train the drug dogs in this case, we find no error in the district court's findings. The record reflects that each of the three dogs was certified as a drug detection canine. (*See* 5/31/2001 Hearing Tr. at 481, 486, 505, 559.) As we recently emphasized, "after it is shown that the dog is certified, all other evidence relating to his accuracy goes only to the credibility of the testimony, not to the dog's qualifications." *United States v. Boxley*, 373 F.3d 759, 762 (6th Cir. 2004); *see also Diaz*, 25 F.3d at 394. The district court heard the testimony of the dogs' handlers and expressly found them to be credible. (*See* 6/5/2001 Memorandum and Order at 3, J.A. at 269.) The court also reviewed the performance statistics and other documentation regarding the dogs, and found that these materials established the dogs' proper training and reliability. (*See id.* at 2-4, J.A. at 268-70.)

We will not disturb these factual findings on the basis of mere suggestions that the training of drug detection dogs could be refined in various ways to improve the reliability of positive alerts. Indeed, it would be particularly inappropriate to insist that a mini-trial be held on a drug dog's training and performance before a law enforcement officer could cite a positive alert as a basis for obtaining a warrant. Even if such a hearing might raise some doubt about the reliability of a particular alert, an officer surely is entitled to rely in good faith upon the existence of probable cause as determined by a neutral magistrate, *see United States v. Leon*, 468 U.S. 897, 926, 104 S. Ct. 3405, 3422 (1984), so long as the dog in question has been generally certified as a drug detection dog. Because the dogs involved in this case were certified, we find no error in the reliance on their positive alerts as a basis for obtaining the May 19 and June 27, 2000 search warrants.

## C.     The Evidence Was Sufficient to Sustain Defendant's Convictions on Counts One, Two, Four, and Five.

As his next series of issues on appeal, Defendant Robinson contends that the evidence at trial was insufficient to support his convictions on Counts One, Two, Four, and Five of the indictment. In reviewing a challenge to the sufficiency of the evidence, we must not "weigh the evidence presented, consider the credibility of witnesses, or substitute our judgment for that of the jury." *United States v. Davis*, 177 F.3d 552, 558 (6th Cir. 1999). "Instead, we determine merely whether, after viewing the evidence in the light most favorable to the prosecution, and after giving the government the benefit of all inferences that could reasonably be drawn from the testimony, a rational trier of fact could find the elements of the crime beyond a reasonable doubt." *Davis*, 177 F.3d at 558. Upon reviewing the evidence presented at trial, we find that the four challenged convictions survive scrutiny under this standard.

### 1.     The Count One Drug Conspiracy Conviction

The jury found Robinson guilty of conspiring to distribute and to possess with intent to distribute both marijuana and cocaine, with this conspiracy involving less than 50 kilograms of marijuana and five or more kilograms of cocaine. On appeal, Robinson argues that the evidence was insufficient (i) to establish an agreement to traffic in cocaine; (ii) to demonstrate a single conspiracy involving both marijuana and cocaine, as opposed to two separate agreements involving discrete groups of people; and (iii) to show that he was responsible for five or more kilograms of cocaine.[32] We find that the evidence at trial was sufficient to sustain the jury's verdict against each of these challenges.

Robinson's arguments all turn to some degree on the government's evidence concerning cocaine trafficking. The prosecution introduced a series of shipping labels indicating that, between April and July

---

[32]Robinson also challenges the sufficiency of the evidence as to the time span of the conspiracy, and contends more generally that the district court erred in determining the sorts of evidence that could be admitted as within the scope of the conspiracy. We view these challenges as largely evidentiary in nature and, accordingly, address them below along with Robinson's other evidentiary issues.

of 1999, several packages were shipped from similar addresses in California to co-defendant Kawyn Logan in Knoxville, Tennessee. One of these packages was intercepted at Los Angeles International Airport in July of 1999 and found to contain approximately one kilogram of cocaine. In all, eight such packages were shipped to Logan, and each package weighed roughly the same amount, leading the government to contend that approximately eight kilograms of cocaine were shipped to Logan in these transactions.

The government also introduced evidence linking Robinson to Logan. The two men were long-time friends, had similar tattoos on their arms, and had been members of the same club in high school. Dena Carmichael testified that she observed the two men counting large sums of money in a back room of Robinson's home on one or two occasions, and that she overheard Robinson speaking to Logan on the telephone regarding "green" and "trees" (meaning marijuana) and "white" (meaning cocaine).

Finally, the prosecution sought to link Robinson and Logan through shipping labels and Federal Express records. These records revealed, for example, that both Logan and "Derrick Palmer," an alias used by Robinson, had shipped packages to various individuals and entities from the "LeFeme Boutique" account established by Dena Carmichael. Under this same account, a package had been sent by "Terry Bilson" to a mailbox opened by Nicole Benlizar at the Mailboxes, Etc. store on Kingston Pike in Knoxville that was the site of the June 27, 2000 search and seizure. "Terry Bilson" was identified as the sender on two of the alleged cocaine shipments made to Logan in the spring of 1999, and trial testimony indicated that Benlizar was Logan's girlfriend.[33]

This evidence, albeit circumstantial and less than overwhelming, is sufficient to sustain the jury's determination that Robinson was guilty of a single conspiracy to traffic in both marijuana and cocaine. Carmichael's testimony, in particular, linked Robinson and Logan in an enterprise that had generated substantial sums of money, and she claimed to have overheard Robinson and Logan discussing both cocaine and marijuana. Next, there was ample evidence that Logan had received a number of similar shipments from similar locations between April and July of 1999, and the government established that one of these packages had been found to contain cocaine. Finally, given the intermingling of shipping accounts, names, and addresses, a reasonable juror could have concluded that the shipments of cocaine and marijuana were part of a single enterprise carried out through the same or similar means.[34]

Viewing this record in its totality, and in a light most favorable to the government, we find that the evidence was sufficient to establish beyond a reasonable doubt each element of the charged cocaine and marijuana conspiracy. This record also would permit a reasonable juror to conclude that this conspiracy involved five or more kilograms of cocaine, where the testimony at trial revealed that one of the packages shipped to Logan in July of 1999 was found to contain one kilogram of cocaine, and where there was

---

[33] The record further revealed that Benlizar had opened mailboxes under the names of "New Breed Entertainment" and "ANR Productions," two names that appeared occasionally as the recipients of packages sent via the "LaFeme Boutique" Fed Ex account. Carmichael testified that "New Breed Entertainment" was a false company name created by Robinson and his friends.

[34] Our reasoning on this issue is in no way altered by the district court's decision at the close of proofs to dismiss the cocaine portion of the charged Count One drug conspiracy as to co-defendant Ronald Brady. As we have explained, "a single conspiracy does not become multiple conspiracies simply . . . because each conspirator was not involved in every aspect of the conspiracy." *United States v. Gravier*, 706 F.2d 174, 178 (6th Cir. 1983). Thus, even if Brady was involved only in the marijuana portion of the conspiracy, this does not require that we treat Robinson as involved in separate marijuana-only and cocaine-only conspiracies.

evidence of seven other, apparently similar shipments to Logan between April and July of 1999.[35] Accordingly, we affirm the jury's guilty verdict on Count One.

### 2.          The Count Two and Count Five Firearm Convictions

Defendant Robinson next challenges the sufficiency of the evidence offered to convict him on Counts Two and Five of the indictment.[36] Robinson was charged in these counts with carrying firearms during and in relation to two drug trafficking crimes — namely, the drug offenses charged in Counts One and Three of the indictment. Both of these charges arose from Robinson's arrest following the May 19, 2000 controlled delivery, and the contemporaneous discovery of two weapons in the Ford Explorer in which Robinson had arrived at the Morristown Pak Mail facility. On appeal, Robinson argues that these two convictions must be overturned because (i) he was outside his vehicle at the time he was apprehended, so that the firearms in his vehicle were not within his reach; (ii) one of the weapons, a shotgun, was found unassembled in a box, and the second weapon was found unloaded in a backpack along with items allegedly belonging to Dena Carmichael; and (iii) there purportedly was no evidence linking the firearms to the drug trafficking offenses. Each of these contentions, however, is squarely defeated by the relevant case law concerning the proper scope and meaning of 18 U.S.C. § 924(c)(1), the statutory provision that Robinson was found to have violated in this case.

In *Muscarello v. United States*, 524 U.S. 125, 118 S. Ct. 1911 (1998), the Supreme Court squarely addressed the meaning of the "carry" prong of § 924(c)(1). Specifically, the Court held that this provision is not "limited to the carrying of firearms on the person," but "also applies to a person who knowingly possesses and conveys firearms in a vehicle, including in the locked glove compartment or trunk of a car, which the person accompanies." *Muscarello*, 524 U.S. at 126-27, 118 S. Ct. at 1913-14. In light of this ruling, we have overturned our prior decisions requiring that a weapon be "immediately available for use," at least in those cases where "a defendant is found with a firearm in his vehicle." *Hilliard v. United States*, 157 F.3d 444, 449 (6th Cir. 1998).

In this case, therefore, it does not matter that the two firearms found in Robinson's vehicle were beyond his reach at the time of his arrest. Rather, the evidence fully satisfies *Muscarello*'s requirements for a "carry" offense under § 924(c), because the two weapons plainly had been conveyed in a vehicle along

---

[35] It is not clear whether Robinson also means to challenge the jury's determination that the conspiracy involved less than 50 kilograms of marijuana. He complains generally that some of the evidence, such as the shipping labels, referred to weights in pounds, and that the government introduced other evidence of drug amounts in grams, but that the indictment and verdict form both referred exclusively to "kilogram" quantities of cocaine and marijuana. Accordingly, at the close of the government's proofs at trial, and then again on appeal, Robinson has argued that the evidence was insufficient to permit a jury determination as to the number of kilograms of cocaine or marijuana involved in the charged Count One conspiracy.

This argument is wholly without merit. First, since the jury's verdict reflects the lowest possible range for marijuana, it could be sustained without any quantity determination whatsoever, beyond the finding that the conspiracy involved *some* detectable amount of marijuana. With regard to cocaine, there was trial testimony that the shipment to Logan in July of 1999 contained a *kilogram* of this substance. (*See* 6/13/2001 Trial Tr. at 176-77, J.A. at 999-1000.) Moreover, to the extent that other evidence referred to the weight of this cocaine in grams, or evidence was introduced concerning pounds of marijuana, we are confident, despite Robinson's objection, that the district court properly took judicial notice of the appropriate multipliers for converting between pounds, grams, and kilograms. We are not aware that this is a matter "subject to reasonable dispute," Fed. R. Evid. 201(b), such that judicial notice would not be appropriate.

[36] As noted earlier, in the event that we affirm Robinson's conviction, the government requests that we remand this case so that the terms of Robinson's incarceration conform to the Brazilian court's extradition ruling. Under this ruling, Robinson has been returned to this country only on the Count One and Count Three drug convictions, but not on the firearms convictions under Counts Two, Four, and Five. Nonetheless, we have elected to address his challenges to the firearms convictions because (i) they rest upon fairly straightforward legal grounds, (ii) neither party has argued that these matters are now moot, and (iii) notwithstanding the sentencing implications of the Brazilian court's decision, we cannot be sure that our rulings on Robinson's underlying firearms convictions might not still have some impact upon resentencing or upon Robinson's record and status going forward. In light of this uncertainty, we leave these matters for the parties and the district court to address on remand.

with Robinson as he traveled to the Morristown Pak Mail facility to pick up a package containing marijuana. Nor does it matter that one firearm was disassembled and the other unloaded, as we have held that a weapon need not be operable or loaded in order to sustain a conviction under § 924(c). *See United States v. Mack*, 258 F.3d 548, 552 (6th Cir. 2001); *United States v. Bandy*, 239 F.3d 802, 805 (6th Cir. 2001).

This leaves only Robinson's contention that the evidence failed to forge the necessary link between the weapons and the charged drug offenses — *i.e.,* that there was no showing that he carried these weapons "during and in relation to" a drug trafficking crime, as required under § 924(c)(1). Dena Carmichael testified that, at Robinson's request, she purchased the pistol found in the Ford Explorer, that she handed this weapon to Robinson as they exited the gun shop, and that she never again had possession of this firearm. As for the shotgun, Robinson reportedly told Carmichael that another girlfriend had obtained this weapon for him, and Carmichael testified that she had seen this weapon both in Robinson's house and his car and that it was assembled. In addition, Daniel McGill, who accompanied Robinson to the Pak Mail facility on May 19, 2000, testified that he had first seen the two weapons about two weeks earlier, when Robinson brought them to a hotel where McGill was staying. The government also produced evidence that the Ford Explorer had been rented under Robinson's alias, Derrick Palmer, that shotgun ammunition was found in the vehicle along with the firearms, and that the handgun and an ammunition clip were found in a bag behind the driver's seat, at a location that was accessible to the vehicle's occupants.

This evidence, viewed in its totality and in a light most favorable to the prosecution, would permit a reasonable juror to conclude that Robinson carried the two weapons "during and in relation to" a drug trafficking offense. Robinson depended on one of his cohorts in his drug enterprise, Dena Carmichael, to purchase one of the firearms found in his vehicle on May 19, 2000, and he specifically showed these weapons to another cohort, Daniel McGill, before McGill accompanied him to pick up a drug shipment that day. In addition, while neither weapon was immediately ready for firing, ammunition for both firearms was found along with the weapons themselves in the vehicle. Under this view of the evidence, a reasonable juror could conclude that it was not mere happenstance that the firearms were in Robinson's vehicle on May 19, but rather that the weapons were brought along in order to embolden Robinson and to prepare him for any contingencies that might arise as he claimed the marijuana shipment. *See United States v. Warwick*, 167 F.3d 965, 971 (6th Cir. 1999); *cf. United States v. Nance*, No. 00-6443, 2002 WL 1359325, at *5 (6th Cir. June 20, 2002) (noting the evidence in that case that the defendant was in the process of moving, so that he had many of his possessions, including his guns, in the back seat and trunk of his car). Consequently, we affirm Robinson's convictions on Counts Two and Five of the indictment.

### 3.          The Count Four Felon-in-Possession Conviction

In Count Four of the indictment, Robinson was charged as a felon in possession of firearms, in violation of 18 U.S.C. § 922(g). His sole challenge to his conviction on this count is that the prosecution failed to prove the existence of the requisite prior felony conviction — or, in the parlance of the federal statute, a conviction of a "crime punishable by imprisonment for a term exceeding one year." 18 U.S.C. § 922(g)(1). Rather, he contends that his 1996 California conviction for battery on a police officer is properly viewed as a misdemeanor, and not a felony, where he was placed on summary probation as a result of this offense and ordered to serve four days in the county jail. In support of this argument, Robinson cites a California Penal Code provision stating that certain categories of crimes are properly classified as misdemeanors if the state court enters "a judgment imposing a punishment other than imprisonment in the state prison." Cal. Penal Code § 17(b)(1).

We addressed precisely this situation in *United States v. Boumelhem*, 339 F.3d 414, 425-27 (6th Cir. 2003). There, as here, the defendant had pled nolo contendere to a so-called "wobbler" offense in a California court — that is, an offense where "the sentence imposed determines the classification under state law as either a misdemeanor or felony." *Boumelhem*, 339 F.3d at 426. We explained that this state-law determination is relevant to a federal conviction under § 922(g), because federal law provides that a "crime punishable by imprisonment for a term exceeding one year" does not include "any State offense classified

by the laws of the State as a misdemeanor and punishable by a term of imprisonment of two years or less." 339 F.3d at 425-26 (quoting 18 U.S.C. § 921(20)(B)). Accordingly, if the defendant's conviction "were classified as a misdemeanor under California law, it would be punishable only by imprisonment not exceeding one year," and hence would be excluded from the federal definition of a "crime punishable by imprisonment for a term exceeding one year." 339 F.3d at 426.

Following the defendant's state court plea in *Boumelhem*, his sentencing proceeding was suspended and he received felony probation, subject to the condition that he spend six days in the county jail. We held that these events did not provide the necessary state-law misdemeanor classification to exempt the defendant from federal prosecution as a felon-in-possession under § 922(g):

> Under California law, where the sentencing court grants probation and proceedings are suspended, no judgment is rendered. Further, at the time [the defendant] took the actions that would form the basis of his federal conviction, the sentencing court had not declared [the defendant's] earlier state conviction to be a misdemeanor. Thus, neither [Cal. Penal Code] § 17(b)(1), which requires a judgment, nor § 17(b)(3), which requires a classification by the court, applied to [the defendant] at the time he took the actions that would lead to his federal convictions. We therefore conclude that the district court properly found that [the defendant] had been convicted for a crime punishable by imprisonment for a term exceeding one year.

339 F.3d at 426 (citations and footnote omitted).

The reasoning and result in *Boumelhem* apply with full force here. Just as in that case, the California court records here reflect that, following Robinson's plea of nolo contendere, the state court suspended the imposition of sentence and placed Robinson on summary probation. (*See* 12/17/1996 California Minute Order at 2, J.A. at 1317; *see also* 12/17/1996 State Court Hearing Tr. at 7-8, J.A. at 1538-39 (reflecting the court's rulings that "proceedings are suspended" and that Robinson was placed on "summary, felony unsupervised probation").) This probation was subject to a number of terms and conditions, including four days' service in the county jail. As Robinson himself concedes, this apparently was the end of the matter, with the record failing to "reflect that the judgment was ever finalized." (Appellant Br. at 58.) All of these circumstances, of course, are precisely the same as those presented in *Boumelhem*, and the same result necessarily is mandated here.

Although the record in this case includes one additional wrinkle, it does not assist Robinson in avoiding this outcome. Specifically, the California court records reflect the state court's ruling that, if Robinson maintained a 3.0 grade point average over the subsequent twelve months of his college studies, his conviction would be reclassified as a misdemeanor. (*See* 12/17/1996 California Minute Order at 2, J.A. at 1317; *see also* 12/17/1996 State Court Hearing Tr. at 8-9, J.A. at 1539-40.) This, of course, is merely a statement of a condition under which the California court agreed to exercise its authority under Cal. Penal Code § 17(b) to classify Robinson's "wobbler" offense as a misdemeanor. Yet, as Robinson acknowledges, nothing in the record indicates that the state court actually exercised this authority, or that it was ever requested to do so — to the contrary, the court records reflect, and a California court official confirmed at trial, that the court never took any action to reduce Robinson's conviction to a misdemeanor.[37] Thus, we find no error in the district court's determination that Robinson had a prior felony conviction within the meaning of § 922(g).

---

[37]Contrary to Robinson's contention, we find no improper burden-shifting in this analysis. The government's proofs demonstrated that Robinson was convicted of a "crime punishable by imprisonment for a term exceeding one year," and further established the absence of any state-law reclassification of this offense to a misdemeanor. It is simply inaccurate, then, to assert that the district court imposed a burden on Robinson to show that his California conviction had been classified as a misdemeanor rather than a felony. Rather, he was merely obliged to explain, if he could, why the records and testimony introduced by the government did not conclusively establish the "prior felony conviction" element of a § 922(g) offense.

**D.      Defendant Was Not Prejudiced by the District Court's Evidentiary Rulings During the Trial and Conduct of the Trial.**

Defendant Robinson next complains that the district court erroneously admitted certain evidence at trial, and that various other prejudicial errors occurred during the trial. Specifically, he argues: (i) that the trial court's overly broad view of the charged Count One conspiracy resulted in the admission of evidence that should have been excluded as hearsay or for lack of proper notice under Fed. R. Evid. 404(b); (ii) that the district court and a government witness made prejudicial statements that warranted a mistrial; and (iii) that the district court failed to take appropriate action in response to Dena Carmichael's purported testimony that she was instructed not to speak with defense counsel. We address each of these contentions in turn.

**1.      Evidence Within the Scope of the Conspiracy**

As noted earlier, several of the issues raised by Robinson on appeal turn upon the admission of evidence as within the scope of the charged Count One drug conspiracy. This evidence includes statements by co-conspirators that were admitted under Fed. R. Evid. 801(d)(2)(E), and acts that, in the trial court's view, were part of the charged conspiracy, and thus did not qualify as "other acts" under Fed. R. Evid. 404(b). Robinson argues that some of this evidence lies outside the temporal scope of his alleged participation in the conspiracy, and that other evidence concerns events occurring and statements made beyond the geographical limits of the conspiracy — a conspiracy which, in his view, did not extend beyond the Eastern District of Tennessee.[38] We find no merit in these contentions.

Whether the challenged evidence was admitted as a co-conspirator statement under Fed. R. Evid. 801(d)(2)(E) or was deemed to be an act intrinsic to the conspiracy, and thus not governed by Fed. R. Evid. 404(b), our inquiry here is largely the same. When the government seeks to introduce a co-conspirator statement under the former Rule, it must establish by a preponderance of the evidence that "there was a conspiracy involving the declarant and the nonoffering party, and that the statement was made 'during the course and in furtherance of the conspiracy.'" *Bourjaily v. United States*, 483 U.S. 171, 175-76, 107 S. Ct. 2775, 2778-79 (1987) (quoting Fed. R. Evid. 801(d)(2)(E)). Similarly, to bring an act within the ambit of a conspiracy, and thus beyond the reach of the notice and other requirements of Rule 404(b), the act in question must be "part of a continuing pattern of illegal activity," and cannot have occurred "at [a] different time[] and under different circumstances from the offense charged." *United States v. Barnes*, 49 F.3d 1144, 1149 (6th Cir. 1995). Here, Robinson challenges certain evidence as beyond either the temporal or geographic scope of the charged drug conspiracy.

Regarding temporal scope, Robinson argues that some of the acts or statements admitted as intrinsic to or during the course of the conspiracy actually pre- or post-dated his membership in the alleged conspiracy. As an example of the former, he points to the evidence of cocaine shipments to co-defendant Kawyn Logan in April through July of 1999. Robinson notes that no witness or other evidence directly linked him with Logan during this time frame — Dena Carmichael testified, for example, that Robinson first introduced her to Logan in late 1999. Accordingly, he reasons that any evidence from the middle of 1999 pre-dated his membership in the conspiracy, and hence could not be admitted as "intrinsic" to the charged conspiracy.

We reject this contention on both factual and legal grounds. As discussed earlier, the shipments to Logan in the spring and summer of 1999 could reasonably have been found by the jury to be part and parcel of a single conspiracy involving cocaine and marijuana. In addition, we already have noted the evidentiary connections between these shipments, the individuals identified on the labels of some of these packages,

---

[38]More generally, Robinson faults the district court for its lack of specificity in holding that the various statements conditionally admitted under Rule 801(d)(2)(E) were shown by a preponderance of the evidence to have been made during the course and in furtherance of the conspiracy. While more detailed findings might be preferable, we have affirmed rulings quite similar to the one made by the district court here. *See*, *e.g.*, *United States v. Maliszewski*, 161 F.3d 992, 1007 (6th Cir. 1998).

and subsequent shipments involving mailboxes that were opened at Robinson's direction. The government also introduced evidence of Robinson's longstanding relationship with Logan, which long pre-dated the mid-1999 shipments to Logan. Finally, even accepting Robinson's assertion that he had not yet joined the conspiracy, "[i]t has long been established that a conspirator may join a conspiracy already in progress and be held responsible for actions done in furtherance of the conspiracy before he joined." *Gravier*, *supra*, 706 F.2d at 177-78.

Likewise, we find a sufficient basis for the district court's admission of statements made and acts occurring after May 19, 2000, despite Robinson's objections that he was in jail during a portion of this period and was in California for part of this time, and despite the testimony of Daniel McGill that his "business" relationship with Robinson ended when the two men were arrested on May 19. Even assuming that Robinson was no longer an active participant in the conspiracy after this date, he is nonetheless presumed to be a continuing member, and is chargeable for the subsequent acts of co-conspirators, so long the conspiracy was ongoing and Robinson did not establish his affirmative withdrawal from the conspiracy. *See United States v. Brown*, 332 F.3d 363, 373-74 (6th Cir. 2003); *United States v. Lash*, 937 F.2d 1077, 1083-85 (6th Cir. 1991). "Mere cessation of activity is not sufficient" to establish withdrawal from a conspiracy, *Lash*, 937 F.2d at 1083, and a defendant's arrest or incarceration does not qualify as an affirmative, volitional act of withdrawal, *see*, *e.g.*, *United States v. Nava-Salazar*, 30 F.3d 788, 799 (7th Cir. 1994); *United States v. Gonzalez*, 940 F.2d 1413, 1427 (11th Cir. 1991). Here, there was ample evidence that the conspiracy continued beyond May 19, 2000 — the June 15, 2000 shipment of marijuana, for example, and the continuing use of mailboxes set up at Robinson's direction. We find no error, therefore, in the admission of statements made and acts occurring after Robinson purportedly discontinued his active participation in the conspiracy on May 19, 2000.

Nor did the trial court err in admitting acts occurring and statements made outside the Eastern District of Tennessee. Robinson's argument on this point rests upon the language in Count One of the indictment that Robinson conspired with others "in the Eastern District of Tennessee," (Second Superseding Indictment at 1, J.A. at 35), and upon the omission of any reference to acts occurring "elsewhere" as is often included in indictments. Yet, Robinson has not cited, nor have we found, any authority for the proposition that such an omission operates as a geographical restriction on the scope of the evidence that may be introduced at trial. *Cf. United States v. Wilson*, 172 F.3d 874, 1999 WL 71499, at *7-*8 (6th Cir. Jan. 14, 1999) (rejecting a challenge to the sufficiency of an indictment, despite its lack of reference to the specific county in which the defendant had engaged in criminal conduct, and explaining that the indictment must be read under a "common sense construction" to determine whether it "sufficiently informed" the defendant of the charges against him).

In any event, much of this purportedly "extraterritorial" evidence had a direct bearing upon events within the Eastern District of Tennessee. Daniel McGill testified, for example, that he moved to Knoxville and began working with Robinson at the suggestion of John Robinson, Defendant's brother, who he lived with in Brazil immediately before he relocated to Tennessee. Similarly, while there was testimony regarding drug-related activities in California, this was directly linked to the shipments of cocaine from California to co-defendant Kawyn Logan in Knoxville. We do not view the indictment, the rules of evidence, or the relevant case law as mandating that the government's evidence be strictly and solely confined within the four corners of the Eastern District of Tennessee. Consequently, we find no error in the district court's rulings as to the admissibility of co-conspirator statements under Rule 801(d)(2)(E) and the inapplicability of Rule 404(b).

### 2.　　Allegedly Prejudicial Statements at Trial

Robinson next contends that he was prejudiced by certain statements made during the trial by the district judge and a government witness, Daniel McGill. We find that none of these statements, even if made in error, provides a basis for reversal.

Robinson first complains that the district court erroneously informed the jury that a non-testifying co-defendant, Kawyn Logan, had pleaded guilty to a felony. As the government points out, however, it is clear that the district judge simply misspoke, and that this error was immediately corrected. During the testimony of Daniel McGill, the court admitted McGill's plea agreement, and then addressed the jury as follows:

> THE COURT: Now, members of the jury, you've heard proof here that Mr. Logan has pled guilty to a felony. You must not consider Mr. Logan's guilty plea to a felony as evidence that either Mr. Robinson or Mr. Brady joined in a conspiracy with Mr. Logan to commit a felony. Additionally, you must not consider Mr. Logan's guilty plea as evidence that either Mr. Robinson or Mr. Brady possessed cocaine and/or marijuana with the intent to distribute it.
>
> Rather — and we're only talking only about this guilty plea now, nothing else about his testimony, but just the guilty plea part of his testimony; rather, you may consider Mr. Logan's guilty plea only in order to assess Mr. Logan's credibility as a witness for the government, and that's the only way you consider it. It's the only purpose for which it is introduced here. Okay.
>
> Any other questions of this man?
>
> GOVERNMENT COUNSEL: Yes, Your Honor. You're referring to Mr. McGill's plea agreement; is that correct?
>
> THE COURT: Yeah. I'm sorry. Mr. McGill, McGill. I'm sorry. Mr. McGill. I misspoke. Mr. McGill, the man testifying here. I got him mixed up with Mr. Logan, who may testify later. McGill, Mr. Daniel McGill, the man seated right here, his plea. That's the only purpose for which you can consider it, to assess his credibility as a witness for the government, that purpose only, nothing else.
>
> I'm sorry I misspoke. All right.

(6/5/2001 Trial Tr. at 39-40, J.A. at 684-85.)

Contrary to Robinson's contention, we do not view this passage as informing the jury that a non-testifying co-defendant, Logan, had pleaded guilty to a felony. Rather, a reasonable juror surely would assume, precisely as he was told, that the district court had erroneously referred to Logan instead of McGill. The district court immediately corrected its misstatement, and there is no reason to suspect that the jury disregarded this curative remark. Consequently, Robinson suffered no prejudice as a result of this mere and isolated slip of the tongue.

Robinson further contends, without citation to supporting authority, that the district court "departed from its impartial role" by purportedly instructing a government witness, Agent Stephen Ribolla, on how to give credible testimony. (Appellant Br. at 63.) On the occasion in question, the district court excused the jury during Agent Ribolla's cross-examination, in order to address a government objection to a line of questioning being pursued by defense counsel. After resolving this matter, and before the jury was returned to the courtroom, the district judge addressed Agent Ribolla:

> THE COURT: You need to answer the questions asked by counsel. You don't need to volunteer extra, extra testimony unless you need to explain an answer. You need to be responsive, forthcoming. You're not an advocate here.

> You've got to understand you're working for the people, and if you appear to be an advocate, you're not working for the people. It doesn't help your case one iota to appear to be prejudiced or an advocate in a situation. Much better to be just forthcoming about it.

> If you don't know, you don't know. If it's something that helps the defendant, so be it. You don't make the facts, you're not here to make facts. That's the way the system works. Now, you're going to have to keep that in mind.

(6/15/2001 Trial Tr. at 67, J.A. at 1066.)

We find nothing so prejudicial in these remarks as to warrant reversal. It is unquestionably the duty of the district court "to conduct the trial in an orderly way with a view to eliciting the truth and to attaining justice between the parties." *United States v. Hickman*, 592 F.2d 931, 933 (6th Cir. 1979) (internal quotations and citations omitted). To the extent that the district judge directed Agent Ribolla to answer defense counsel's questions truthfully and without evasion or embellishment, he acted entirely within this proper role. Rather than giving impermissible advice to Agent Ribolla, it strikes us that the district court's instructions were an appropriate admonition as to the proper role and obligations of a government agent when he is called as a witness at trial.

Robinson next objects —once again, without citation to authority — to the district court's allegedly prejudicial comments and conduct toward defense counsel. Out of the many hours of testimony during a two-week trial, Robinson cites a brief period in which the trial court admonished defense counsel, in the presence of the jury, that he should "move on" from a question that had been "asked and answered twice," and that he was standing next to and "preaching to the jury," in violation of a local court rule that requires counsel to remain at the podium. (6/5/2001 Trial Tr. at 70, 76, J.A. at 715, 721.) In further addressing this latter issue, the district court stated to defense counsel that he was "a good lawyer," but "get carried away sometimes," and he cautioned counsel not to "get smart with me now." (*Id.* at 77, J.A. at 722.)

This single exchange in the midst of a contentious trial does not remotely approach the repeated expressions of partiality or bias that we have found necessary to warrant reversal. *See*, *e.g.*, *Hickman*, 592 F.2d at 934-36. To the contrary, we view this as an understandable expression of the trial court's legitimate desire to retain control over the mode and manner of counsel's interrogation of a witness. *See* Fed. R. Evid. 611(a). Indeed, if a trial judge's isolated annoyance with counsel were grounds for a mistrial, it seems fair to say that many cases would never be tried to completion. Moreover, in its final instructions to the jury, the district court cautioned the jury not to "interpret my rulings on [the attorneys'] objections as any indication of how I think this case should be decided," and emphasized that "nothing that the court did during the course of the trial is to suggest or convey to you in any way or any manner as to what I think this verdict should be in this case." (6/18/2001 Trial Tr. at 113, 144, J.A. at 1154, 1185.) We presume that the jury heeded these instructions. Consequently, we find that this isolated incident, featuring brief and mild remarks rather than a harsh rebuke, did not result in any prejudice to Robinson's fair trial rights.

Finally, Robinson claims that he was prejudiced by a statement in Daniel McGill's testimony that "[y]ou make sure you repent for your sins." (6/5/2001 Trial Tr. at 18, J.A. at 663.) Although Robinson contends that this remark was directed at him, it appears equally likely from the surrounding context that McGill was repeating a remark made to him by a "voodoo priest" in Brazil. Nor can Robinson plausibly say how the jury might have construed this testimony, where his counsel failed to object, and later acknowledged that he had not heard McGill's statement. (*See id.* at 18, 26, J.A. at 663, 671.) More importantly, defense counsel declined the district court's offer of a curative instruction, and expressly agreed with the court's observation that any such instruction was likely only to emphasize a statement that the jury also might not have heard or understood. (*See id.* at 27, J.A. at 672.) Under these circumstances, we find no error in the district court's handling of this incident.

### 3.     Dena Carmichael's Testimony Regarding a Purported Instruction Not to Talk to Defense Counsel

As his final claim of prejudice at trial, Robinson challenges the district court's handling of Dena Carmichael's testimony that she was instructed by the government's counsel not to talk to Robinson's attorney (or anyone else) about the case. Specifically, Carmichael testified that "I was told not to talk to anybody about this case," and that this instruction came from "my lawyer for one, and the district attorney [*i.e.,* the Assistant U.S. Attorney] also told me that." (6/5/2001 Trial Tr. at 170, J.A. at 815.) Robinson argues that this instruction by government counsel interfered with his established right to interview witnesses.

As the government correctly points out, however, the district court promptly explored this matter in a *voir dire* examination of Carmichael outside the presence of the jury. During this examination, Carmichael clarified her earlier testimony, stating that her lawyer had instructed her not to talk to anyone about the case, but that the Assistant U.S. Attorney, as well as the two federal law enforcement officers on the case, had merely advised her that she "didn't have to talk to anybody" if she did not wish to. (*Id.* at 178-79, J.A. at 823-24.) This testimony satisfied the district court that nothing improper had occurred. We find no basis to disturb the district court's resolution of this factual issue, nor has Robinson cited any authority indicating that the advice given by government counsel to Carmichael was improper.

## E.     The District Court Did Not Err in Its Jury Instructions.

Robinson next argues that the district court's instructions to the jury were erroneous in five different respects. Yet, as to all but one of these challenges, Robinson presents his arguments in wholly cursory fashion, without any citation to supporting authority. We have cautioned that "[i]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived," and that "[i]t is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones." *McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997) (internal quotations and citation omitted); *see also United States v. Reed*, 167 F.3d 984, 993 (6th Cir. 1999) (invoking this rule to deem an issue forfeited). In any event, we have already addressed several of these issues — *e.g.,* the question of a single versus multiple conspiracies, the characterization of Robinson's prior California conviction, and the claim of withdrawal from the conspiracy — and other contentions are contradicted by the record — *e.g.,* the claim that the district court failed to inform the jury that its determinations as to drug quantities must be unanimous and beyond a reasonable doubt, (*see* Verdict Form at 2, J.A. at 323 (requiring unanimous findings of drug quantities beyond a reasonable doubt)).

This leaves only Robinson's contention that the district court erroneously declined to present his proffered theory of defense to the jury, and instead stated this theory in a more summary fashion. Upon reviewing the record, however, we do not share Robinson's view that the district court's statement did "nothing more than explain[] the significance of Robinson's not guilty plea." (Appellant Br. at 67.) Rather, we find that the district court's presentation captured the essence of Robinson's submission, and merely omitted certain unnecessary and repetitive details such as, for example, the contention that Dena Carmichael was not a truthful witness. We conclude, therefore, that the district court did not abuse its discretion in this matter.

## F.     A Remand Is Necessary for Resentencing.

Turning, finally, to the matter of sentencing, Defendant Robinson argues that the district court erred by sentencing him *in absentia,* and that the court also misapplied the Sentencing Guidelines in determining his sentence. We find no merit in the first of these challenges, but agree that the district court's application

of the Sentencing Guidelines was deficient in one respect, and accordingly remand this case for resentencing.[39]

### 1.    Sentencing *in Absentia*

Shortly after trial and prior to his scheduled sentencing, Robinson escaped from federal custody at the Blount County Jail. The district court elected to proceed with sentencing in Robinson's absence, and declined to reopen this proceeding when Robinson was apprehended in Brazil about a week after the sentencing hearing. Robinson now contends that the district court erred in sentencing him *in absentia,* and in declining to convene another sentencing hearing after his counsel had an opportunity to address various sentencing matters with him while he remained in Brazilian custody. We review the district court's decision on this matter for clear error, *see United States v. Watkins*, No. 02-4174, 2004 WL 237412, at *2 (6th Cir. Feb. 6, 2004), and find no such error here.

Under Fed. R. Crim. P. 43(b)(2), as it read at the time of Robinson's sentencing, the "further progress of the trial to and including . . . the imposition of sentence, will not be prevented and the defendant will be considered to have waived the right to be present whenever a defendant, initially present at trial, . . . is voluntarily absent at the imposition of sentence."[40]   At the November 28, 2001 sentencing hearing, the district court heard the testimony of a corrections officer regarding Robinson's July 12, 2001 escape from the Blount County Jail. Although defense counsel argued that this did not establish Robinson's voluntary absence from the sentencing hearing, the district court held otherwise, and this determination was not clearly erroneous. *See Watkins*, 2004 WL 237412, at *2-*3 (upholding a finding of voluntary absence where the defendant was several hours late for a sentencing hearing, and where he previously had failed to regularly report to pretrial services as required under the terms of his release, resulting in a warrant for his arrest and the revocation of bond); *United States v. Jordan*, 216 F.3d 1248, 1249-50 (11th Cir. 2000) (holding that the defendant was voluntarily absent where he escaped from custody following his guilty plea and remained at large on the date of his sentencing hearing).

Nonetheless, Robinson argues that he was no longer "voluntarily absent at the ***imposition of sentence,"*** as required to find a waiver under Rule 43(b)(2), where he was apprehended a few days after the sentencing hearing and was in Brazilian custody by the time the district court formally entered its judgment on December 18, 2001. He has not cited any authority for this proposition, however, and we are not inclined to adopt a hypertechnical reading of Rule 43 that would deny the significance of a sentencing hearing. The Rule, after all, is addressed solely to the subject of a defendant's presence at various stages of a criminal proceeding, including sentencing. By specifying that voluntary absence operates as a waiver of the right to be present, the Rule plainly means to refer to proceedings that a defendant otherwise would be expected to attend. With regard to sentencing, the pertinent event is the ***hearing,*** at which a defendant is afforded the opportunity to address any issues relevant to his sentence. The entry of judgment, in contrast, is not such an occasion, and a defendant is not expected to be present at this time. Consequently, we find no abuse of discretion in the district court's determinations (i) that Robinson waived his right to be present at sentencing by virtue of his voluntary absence from the November 28 and 29, 2001 sentencing hearings, and (ii) that

---

[39]In a supplemental filing after oral argument, Robinson suggests that the Supreme Court's recent decision in *Blakely v. Washington*, 124 S. Ct. 2531 (2004), casts further doubt upon the validity of his sentence. In *United States v. Koch*, ___ F.3d ___, 2004 WL 1899930 (6th Cir. Aug. 26, 2004) (*en banc*), however, we held that *Blakely* does not invalidate the Sentencing Guidelines. Should the Supreme Court decide otherwise in a subsequent ruling, of course, the parties may revisit this matter at resentencing.

[40]Under the present version of the Rule, this waiver provision has been moved to subsection (c) and reworded slightly, now speaking of voluntary absence "during sentencing." Fed. R. Crim. P. 43(c)(1)(B).

this right was not reinstated, and that the sentencing hearing need not be reconvened, as a result of Robinson's capture after the hearings but before the entry of judgment.[41]

## 2.     The District Court's Application of the Sentencing Guidelines

Robinson advances both legal and factual challenges to the district court's application of the Sentencing Guidelines in determining his sentence. We find no merit in his legal challenges, but agree that the trial court's factual findings are insufficient to sustain his sentence.

As his sole legal challenge, Robinson contends that the district court engaged in impermissible "double counting" by citing his escape from jail as a basis both for (i) denying a two-level downward adjustment for acceptance of responsibility under U.S.S.G. § 3E1.1, and (ii) applying a two-level enhancement for obstruction of justice under U.S.S.G. § 3C1.1. Yet, even assuming that "double counting" occurred here, we have observed that "the Sentencing Guidelines expressly mandate double counting under some circumstances through the cumulative application of sentencing adjustments." *United States v. Farrow*, 198 F.3d 179, 194 (6th Cir. 1999). More specifically, we have identified the precise situation presented here — namely, an escape from custody before trial or sentencing — as one in which the "guidelines expressly contemplate using the same conduct to enhance a sentence and to deny a sentence reduction." *United States v. Tevepaugh*, No. 00-6641, 2002 WL 22029, at *2 (6th Cir. Jan. 2, 2002).

Robinson does not dispute that his escape provides an appropriate basis for a two-level obstruction enhancement under U.S.S.G. § 3C1.1 — and, indeed, the application notes to § 3C1.1 expressly cite an escape before sentencing as an example of conduct warranting this enhancement. *See* U.S.S.G. § 3C1.1, cmt. n.4(e). Yet, having conceded this point, Robinson confronts the considerable obstacle that "[c]onduct resulting in an enhancement under §3C1.1 . . . ordinarily indicates that the defendant has not accepted responsibility for his criminal conduct," and that it is only "*extraordinary* cases in which adjustments under both §§ 3C1.1 and 3E1.1 may apply." *United States v. Angel*, 355 F.3d 462, 477 (6th Cir. 2004) (quoting U.S.S.G. § 3E1.1, cmt. n.4). Thus, the Sentencing Guidelines not only permit the "double counting" challenged by Robinson here, they dictate that this is the proper result in all but the most "extraordinary" cases. Robinson has not even attempted to suggest how his circumstances might qualify as extraordinary — and, in fact, even in the absence of his escape from custody, we are somewhat at a loss to see what action Robinson might have taken at any point in these proceedings that would reflect his acceptance of responsibility. *See*, *e.g.*, *United States v. Hough*, 276 F.3d 884, 895 (6th Cir. 2002) ("While going to trial does not preclude such a decrease [for acceptance of responsibility], it certainly does not make denial of the decrease a reversible error."). We find no legal infirmity, therefore, in the enhancement of Robinson's sentence under § 3C1.1 and the denial of a downward adjustment under § 3E1.1.

Nonetheless, we agree with Robinson that the district court did not make the requisite factual findings in support of its application of the Sentencing Guidelines, and that a remand is necessary to rectify this omission. In the court below and again on appeal, Robinson has challenged the quantities of cocaine and marijuana for which he should be held responsible, the four-level enhancement under U.S.S.G. § 3B1.1(a) for his role in the drug conspiracy offense, and the two-point increase in his criminal history under U.S.S.G. § 4A1.1(d) for committing the drug conspiracy offense while still on probation for his California battery offense. In resolving these and other factual issues at sentencing, the district court stated:

> THE COURT: What I am going to do shouldn't be much to your surprise. I am going to adopt the Presentence Report and the addendum, as will be amended . . . . I am

---

[41]We note that the present version of Rule 43 no longer refers to absence "at the imposition of sentence," but instead speaks of voluntary absence "during sentencing." The advisory committee notes accompanying this revision indicate that this change was purely stylistic, and not substantive. This lends further support to our conclusion that a defendant's voluntary absence from a sentencing hearing operates as a waiver of his right to be present at sentencing, even if he then appears before the entry of judgment.

going to adopt that in its entirety as part of the order of this court rather than go through all of it and read it off which would be just — you have already seen it.

(11/29/2001 Sentencing Hearing Tr. at 47-48, J.A. at 1286-87.)  Later in the hearing, the district court reiterated:

> THE COURT:  I am adopting [the presentence] report on all those things.  I have noticed other district judges do this and it saves them a lot of time and the attorneys a lot of time.  The Court of Appeals has approved that . . . .  I am going to start doing it too.  I used to sit here and write a long opinion on it.  Now all we do is adopt it because we were anyway for the most part.

(*Id.* at 51, J.A. at 1290.)

As Robinson points out, Fed. R. Crim. P. 32(c)(1) provided, at the time of his sentencing, that "[f]or each matter controverted, the court must make either a finding on the allegation or a determination that no finding is necessary because the controverted matter will not be taken into account in, or will not affect, sentencing."[42]  We require "literal compliance" with this provision, in order to "ensure that sentencing is based on reliable facts found by the court itself after deliberation, not on the delegation of the fact-finding process to the probation officer or the prosecution." *United States v. Parrott*, 148 F.3d 629, 633 (6th Cir. 1998) (internal quotations and citation omitted).  "The law in this circuit clearly prohibits a court faced with a dispute over sentencing factors from adopting the factual findings of the presentence report without making factual determinations of its own." *United States v. Monus*, 128 F.3d 376, 396 (6th Cir. 1997).

The district court's ruling at sentencing in this case ran afoul of this prohibition.  Nonetheless, a remand is not necessary if this error was harmless — as would be true, for example, if the purportedly "disputed" factual issues could be conclusively resolved under the record before us. *See*, *e.g.*, *United States v. Carter*, 374 F.3d 399, 408 (6th Cir. 2004); *Parrott*, 148 F.3d at 633-34.  We cannot say that the error here was clearly harmless, however.  Rather, each of the above-cited factual issues can only be resolved by weighing the evidence, assessing the credibility of witnesses, and employing other fact-finding means that are unavailable in this appellate forum.  Consequently, we remand this case for resentencing, at which time the district court can make rulings on these issues in accordance with the command of Rule 32.[43]

## IV. *CONCLUSION*

For the reasons set forth above, we AFFIRM the conviction of Defendant/Appellant Michael A. Robinson, but REMAND this case to the district court for resentencing in accordance with this decision.

---

[42] The present version of Rule 32 imposes a similar requirement, but the pertinent language has been relocated to subsection (i)(3)(B) of the Rule.

[43] Because we have determined that a remand is necessary, the district court also should address at resentencing the extradition-related concerns raised by the government and noted earlier in this decision.