**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 12a1154n.06

**Nos. 10-6029, 10-6031, 10-6032, 10-6422, 10-6440**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | **FILED**<br>*Nov 07, 2012*<br>DEBORAH S. HUNT, Clerk |
|  | ) |  |
| Plaintiff-Appellee, | ) | ON APPEAL FROM THE |
|  | ) | UNITED STATES DISTRICT |
| v. | ) | COURT FOR THE EASTERN |
|  | ) | DISTRICT OF TENNESSEE |
| JUSTIN BLAKE-SALDIVAR et al., | ) |  |
|  | ) |  |
| Defendants-Appellants. | ) |  |
|  | ) |  |

BEFORE: GILMAN, GIBBONS, ROGERS, Circuit Judges.

ROGERS, Circuit Judge. Defendants-appellants were convicted of conspiracy to distribute a massive amount of marijuana. Of thirty-three indicted defendants, seven went to trial, and five were found guilty. All five now appeal. Although the individual cases share common facts, many of the issues on appeal are unique to each individual. The issues on appeal include evidentiary issues, challenges to the jury instructions, arguments about the sufficiency of the evidence, allegations of a mistrial, and sentencing challenges. As explained below, none of the defendants-appellants' arguments warrants reversal.

## I. BACKGROUND

### A. *Investigation of the Conspiracy*

This case began with a handful of traffic stops and ended with the disruption of a major network of drug distribution that brought marijuana from Mexico to places like Johnson City,

Tennessee. Sheriffs' departments in eastern Tennessee conducted the first two stops. In the first stop, on August 9, 2007, defendant Jesus Huerta, defendant Carlos Hernandez, and two other men were found with $1400, an unlawful Glock nine-millimeter handgun, and ammunition. Huerta also had 2.3 grams of cocaine on his person. After Huerta was charged with federal drug and firearms offenses, Huerta made two proffer statements to DEA agents regarding his trafficking activities. In the second stop, in November 2007, a codefendant who is not part of this appeal was caught with forty-four pounds of marijuana in a rental car. Based on connections between a business card that was found in the rental car and a triple murder in Louisville, Kentucky, DEA Special Agent Michael Templeton opened a federal investigation.

Following these two stops, federal agents stopped two cars leaving Huerta's house. In one car, Huerta possessed a social security card and birth certificate bearing the name of James Loya. In the other car, Raymundo Miller-Guerra (who is believed to have been the leader of the conspiracy) was driving and defendant Javier Flores-Delacruz, Miller-Guerra's brother-in-law, was a passenger. When asked for identification, Flores-Delacruz presented identification bearing the name of James Loya and a photograph of Huerta. During a search of this vehicle, agents seized over $21,000.

While these first four stops indicated illegal and suspicious activity, a fifth stop revealed the scale of the conspiracy. On May 13, 2008, Texas state troopers pulled over a recreational vehicle (RV) because it twice crossed the white "fog line" and drove on the shoulder. The driver, defendant Wiley E. Barnett, consented to a search, and the troopers found approximately six hundred pounds of marijuana in seventeen bundles.

Two weeks after the stop of the RV, agents went to 750 Georgia Street, Johnson City, Tennessee on an unrelated matter. On the back porch of the house, agents saw suspicious items such as money wrappers and a cooler from which the insulation had been removed. A codefendant who is not part of this appeal consented to a search of the residence. Inside the residence, agents found marijuana, two sets of digital scales, a vacuum sealer and bags, five cellular phones, $2900 in concealed cash, and another cooler, which appeared brand new. After a trained canine alerted to the cooler, agents found $80,010 in cash concealed where the cooler's insulation normally would be. The agents could also see marijuana growing outside the house and obtained a search warrant for the remainder of the property. After a trained canine alerted to an outbuilding, agents found freshly turned soil. Agents found buried in the hole a twelve-gauge shotgun, five handguns, and discarded plastic packaging that contained marijuana residue and was marked with silver stars and the initials "WB." Based on the size of the packaging, Agent Templeton estimated that each package held ten to fifteen pounds of marijuana. In addition, the packaging appeared identical to the packaging of the bundles found in the RV that Wiley Barnett was driving. Barnett resided nearby at 760 Georgia Street and leased 750 Georgia Street.

On July 7, 2008, agents executed search warrants for other properties in Johnson City. At Hernandez's residence, agents found digital scales, marijuana residue in a U-Haul cardboard box measuring four cubic feet, and spiral notebooks that agents characterized as drug ledgers. One notebook showed that "Chips" (later identified by codefendants as Huerta) regularly obtained ten-

pound quantities. At Huerta's residence, agents seized a vacuum sealer, a box for digital scales, and a spiral notebook alleged to be a drug ledger.

On July 30, 2008, agents obtained a search warrant for Barnett's residence at 760 Georgia Street. Before the search began, Barnett agreed to cooperate with the agents and provided phone numbers for four people, including Miller-Guerra. Barnett said that between January and May 2008, he made four trips to and from Houston to deliver drugs or money. During the search of the property, agents found items that linked Barnett, Huerta, and other codefendants, as well as Miller-Guerra.

A new aspect of the investigation developed in September 2008 when U.S. Forest Service officers discovered a campsite in a remote area of Pisgah National Forest in North Carolina. At the campsite, officers found piles of cut marijuana as well as hundreds of marijuana plants. Using surveillance, the officers observed codefendants who are not part of this appeal harvesting marijuana. Early in the morning on September 23, 2008, officers saw a car near the trail leading to the campsite and heard the car's doors being opened and shut, from which they inferred that three people had left the car and gone into the woods. Around 6:00 p.m. that evening, officers heard people coming out of the woods and saw them carrying large bags. A blue van arrived soon after and picked up the men and their bags. Using a roadblock, officers stopped the van and found that it was driven by Barnett and carried three codefendants and 193.6 pounds of fresh marijuana. Officers also found a .45-caliber pistol in the pocket of one of the duffel bags containing the marijuana.

The investigators subpoenaed Western Union for records related to the suspects. Records showed payments going to and from a number of people in the alleged conspiracy. One record showed two payments from Tina Porter to Justin Blake-Saldivar, for $2500 and $3000. Another showed a payment of $900 from "James Loya" to Flores-Delacruz. This amount was below the $1000 threshold at which Western Union requires the sender to show identification.

The alleged conspirators were arrested and the grand jury for the Eastern District of Tennessee issued a series of indictments. Miller-Guerra was murdered in Houston on December 8, 2009. The trial of the seven defendants took place in January 2010.

B. *Arguments of Defendants-Appellants and Related Facts*

1. Justin Blake-Saldivar (Appeal No. 10-6029)

The jury convicted Blake-Saldivar of conspiracy to distribute and possess with intent to distribute at least one hundred, but less than one thousand, kilograms of marijuana. The key evidence against Blake-Saldivar came from Tina Porter, the girlfriend of conspirator Jose Colunga. Porter testified that in 2007 or 2008, Blake-Saldivar came to collect money that Jose Colunga owed to a Texas marijuana supplier, and on other occasions, he accepted vehicles as payments for drugs. Porter said she never saw Blake-Saldivar personally carrying marijuana, but "shortly after he came, and there were no other visitors to the home, there was marijuana there that was not there before." Trial Tr., 30, Jan. 19, 2010.

Further evidence came from coconspirator Melody (Colunga) Bailey, wife of coconspirator Jeff Bailey. Melody Bailey testified that Blake-Saldivar, whom she knew as "Rudy," delivered

marijuana to them on at least two occasions, with each delivery being for at least two hundred pounds. On two other occasions, Blake-Saldivar picked up drug proceeds.

On appeal, Blake-Saldivar makes two arguments: (1) the trial court should have granted his Rule 29 motion because the evidence was insufficient, and (2) a sequestration violation occurred and therefore the trial court should have granted his motion for a mistrial.[1]

The alleged sequestration violation occurred because testifying codefendants shared a cell, spoke about the case, and had access to other witnesses' plea agreements. Blake-Saldivar says that the trial court instructed the witnesses not to discuss the case with one another, but Blake-Saldivar does not point to any evidence that the trial judge gave any orders about the manner in which the codefendant witnesses were to be held. The minimal extent of the influence of codefendants on one another is shown by the following colloquy between Hernandez's counsel and codefendant Jonathon Shell following Shell's statement that he had been at the courthouse waiting to testify for three days and during that time, had been housed with codefendants Bennett, Jose Colunga, and Juan Colunga:

> Q: Okay, and you've had an opportunity to discuss the case?
> A: Yes.
> Q: Yes?
> A: Yes.
> Q: Okay. Did Mr. Bennett [who testified on January 13] explain his testimony, what he had – what had been testified to when he got down there?
> A: No.
> Q: Didn't discuss his testimony at all?

---

[1] In the summary-of-arguments section of his brief, Blake-Saldivar also raises a third argument: that the verdict was invalid due to the foreman's failure to sign the verdict form. However, this argument was not actually briefed, so it is waived. Fed. R. App. P. 28(a)(9).

A: He told me about some of it. I mean, he didn't go over the whole testimony with me.

Q: Okay. Did he tell you the questions that you were going to be asked by defense counsel?

A: No.

Q: Okay. Did he tell you the questions you were going to be asked by the government?

A: No.

Q: Okay. What did he tell you?

A: He just told me that, that, how, what, I guess [defense counsel for Huerta] had tried to catch him up in lies with the multiplication of something and of the drug ledgers, I believe, or I don't know what he was talking about exactly.

Q: Is that basically the extent of what he told you?

A: Yes; I mean, just – that's about it.

Trial Tr., 181–82, Jan. 15, 2010.

There was also a colloquy regarding the plea agreements:

Q: Were you provided other plea agreements that were entered into by other of the codefendants in this case?

A: No, Sir.

Q: You have not read those?

A: I read them last night. I never received them myself.

Q: You read them last night? . . . How did you have them to read?

A: Jeremy Bennett had them.

Q: . . . Who[se] plea agreement did you read?

A: Jose's, he had mine, his, Jeff Fair's, Ricky Tipton's. There may have been a couple more; I mean, I didn't read all of them word for word, I just flipped through them.

Q: So . . . have you testified . . . from your personal knowledge or . . . from your conversations with your co-defendants and the plea agreements that you've read?

A: No, from my personal knowledge.

*Id.* at 183.

During a jury recess, Blake-Saldivar joined in a motion for mistrial because "government witnesses . . . have been allowed to sit down there [in a holding cell] together and discuss

- 7 -

something." *Id.* at 193. The court denied the motion, saying "At best, what you've shown is a minor technical violation of [Rule 615 of the Federal Rules of Evidence].[2] No prejudice [to the defendants] is even argued . . . [and] none is shown." *Id.* Blake-Saldivar renewed this motion after trial and now raises his argument here on appeal.

### 2. Wiley E. Barnett (Appeal No.10-6031)

Barnett, the driver of the RV and the van, moved the district court to suppress the evidence from the RV, arguing that the Texas state troopers lacked probable cause for any traffic violation that would justify an investigative stop. The magistrate judge recommended that the motion be denied, and the district court adopted that recommendation. Barnett was convicted by the jury on two counts, (1) conspiracy to manufacture one thousand or more marijuana plants, and (2) conspiracy to distribute one thousand or more kilograms of marijuana. He received a two-level sentence enhancement for possession of a dangerous weapon as a result of the .45-caliber pistol that was found in the duffel bag of marijuana that he was transporting out of Pisgah National Forest. His sentence was set at the statutory minimum.

On appeal, Barnett makes three arguments: (1) the district court should have granted his suppression motion regarding the evidence in the RV, (2) once the evidence from the RV is

---

[2] Rule 615 provides, "At a party's request, the court must order witnesses excluded so that they cannot hear other witnesses' testimony. Or the court may do so on its own." Although Rule 615 only refers to exclusion from the courtroom, the common-law power of exclusion is understood to grant trial judges "broad power to sequester witnesses before, during, and after their testimony." *Geders v. United States*, 425 U.S. 80, 87 (1976).

excluded, there was not sufficient evidence to convict him, and (3) the district court erred in finding that Barnett constructively possessed the .45-caliber pistol.

### 3. Carlos Hernandez (Appeal No. 10-6032)

The primary evidence against Hernandez came from the July 3, 2008 search of his residence in Johnson City. As mentioned previously, the search uncovered digital scales (which were broken), marijuana residue in a U-Haul cardboard box measuring four cubic feet, and spiral notebooks that agents characterized as drug ledgers. Hernandez moved to suppress this evidence, arguing that the informant referred to in the affidavit was unreliable, that the information was stale, and that the affidavit failed to establish the necessary nexus between Hernandez's residence and the items sought. The magistrate judge found that the affidavit showed probable cause that Hernandez was involved in drug trafficking and that evidence of trafficking would be found at his residence. The district court upheld the search.

At trial, multiple codefendants testified that Hernandez sold bulk marijuana that he received from other conspirators such as Jose Colunga, Luis Colunga, and Jesus Huerta. The jury convicted Hernandez of conspiracy to distribute at least one hundred kilograms of marijuana.

Here on appeal, Hernandez renews the arguments he made in his motion to suppress and additionally argues that the evidence was not sufficient to support the jury's finding of guilt.

### 4. Javier Flores-Delacruz (Appeal No. 10-6029)

Flores-Delacruz appears to have played a peripheral role in the conspiracy. There was the $900 Western Union transfer from "James Loya" to Flores-Delacruz. The other principal physical

evidence against Flores-Delacruz consisted of slips of paper and a business card from Elizabethton, Tennessee found in Flores-Delacruz's wallet when he was arrested in January 2009 as he was crossing the Mexican border. The slips of paper and business card had handwritten notes that officers characterized as drug ledgers.

The Government also introduced a sales receipt that connected Flores-Delacruz to people involved with the conspiracy. The receipt was seized in a search of Artech Auto Sales in McAllen, Texas, a business frequented by Miller-Guerra (who was accompanied there at least once by Flores-Delacruz). The receipt showed a vehicle transfer form listing Flores-Delacruz's address in Pharr, Texas (which is directly adjacent to McAllen) and his sister-in-law Diana Rojas's name.

The prosecution called as a witness Norman Lambridia, Miller-Guerra's longtime friend and partner in the marijuana business. Lambridia knew that Miller-Guerra had been pulled over by police in Johnson City and had $20,000 taken from him while riding with Flores-Delacruz, whom Lambridia referred to as Miller-Guerra's brother-in-law. Lambridia appears to have believed that Miller-Guerra had two brothers-in-law: one around McAllen, Texas, who took money and drugs across the border, and one around Johnson City, who was holding money.

Flores-Delacruz now argues (1) that the Artech Auto Sales receipt and the testimony of Lambridia should have been excluded, (2) that the district court failed to provide a proper jury instruction to guide the jury in evaluating the fact and opinion aspects of officer testimony, and (3) that the evidence against him was insufficient to support his conviction.

5. Jesus Huerta (Appeal No. 10-6440)

Huerta's August 9, 2007 arrest appears to be the event that set the investigation into motion. The jury convicted Huerta of conspiracy to distribute and possession with intent to distribute at least one thousand kilograms of marijuana and conspiracy to manufacture one thousand or more marijuana plants. On appeal, Huerta takes issue with: (1) references made at trial to the August 2007 arrest and subsequent firearm charge, (2) the introduction of hearsay from a coconspirator, and (3) a sentencing enhancement for possession of a dangerous weapon.

Prior to trial, Huerta moved to suppress evidence related to the federal firearms charge—which had been dismissed—resulting from the August 9, 2007 arrest. The prosecution responded that the "only evidence that the United States will use from that case at trial in the instant case is evidence of the fact that [Huerta] and co-defendant Hernandez were in a car together on August 9, 2007." Resp. to Def.'s Mot. to Suppress Previously Suppressed Evidence, 2, Oct. 21, 2009. Based upon this response, the district court found Huerta's motion to suppress moot.

At trial, several witnesses for the prosecution referred to the earlier firearm charge against Huerta. Lieutenant William Douglas of the Washington County Sheriff's Department testified about why they were watching Huerta's house on December 4, 2007. Douglas said they were "conducting surveillance at [Huerta's residence] in reference to a[n] ATF firearms violation warrant that was out of federal court." Trial Tr., 8, Jan. 7, 2010. A few minutes later, Douglas said that he "thought we had actually caught Jesus Huerta," implying Huerta's previous criminal activity. Similarly, Sergeant Sam Phillips of the Washington County Sheriff's Department testified that they "were looking for

a Jesus Huerta on a guns violations charge." Trial Tr., 239, Jan. 13, 2010. Huerta objected to both statements and moved for a mistrial. The district judge admonished the prosecution for not properly preparing its witnesses but found no justification for a mistrial.

Similarly, Special Agent Jenny Davis of the U.S. Forest Service improperly introduced hearsay statements made during a confession by codefendant Wiley Barnett about his relationship to Huerta (whom he knew as "Chuy"). Although the court discussed what Agent Davis could say without violating *Bruton v. United States*, 391 U.S. 123 (1968), and specifically stated that Barnett's statement was inadmissible, Agent Davis stated her recollection of what Barnett said concerning "Chuy." Huerta moved for a mistrial. The district court, despite being frustrated with the prosecution and its witnesses, found no basis for a mistrial. Later, after receiving the jury's verdict, the trial court granted Huerta a new trial for the count related to conspiracy to manufacture marijuana plants. Rather than re-try Huerta on this charge, the prosecution dismissed it.

Huerta now argues that the district court erred by failing to grant a mistrial for the count related to conspiracy to distribute marijuana.

Huerta also argues that, at sentencing, the trial court erred in applying a two-level firearm enhancement under United States Sentencing Guidelines § 2D1.1(b)(1), which contributed to a sentence above the mandatory minimum. To support a finding that Huerta possessed a firearm during the conspiracy, the trial court relied upon the testimony of two witnesses regarding three separate firearms. Jeremy Bennett testified at trial that, in early 2007, he traded Huerta a twelve-gauge Mossburg shotgun for a half pound of marijuana and also sold Huerta a Ruger nine-millimeter

handgun for $250. When federal agents found guns buried at 750 Georgia Street, two of the guns

matched these descriptions. William Bradford testified during a sentencing proceeding that he owed

Huerta $1500 for a marijuana debt and gave Huerta a Sig nine-millimeter handgun as payment.

Bradford also testified that Huerta carried the Sig while delivering marijuana. The trial court found

Bennett and Bradford credible and found by a preponderance of the evidence that the prosecution

had shown that Huerta possessed a firearm. This finding supported a two-level firearm enhancement

that Huerta now challenges on the basis that the witnesses against him were not credible and the Sig

nine-millimeter handgun that Bradford testified about was not mentioned in the presentence report.

## II. ANALYSIS

For the reasons described below, all of the defendants-appellants' arguments fail.

### A. *Evidentiary Arguments*

#### 1. Barnett's Suppression Motion

Barnett argues that because the Texas state troopers lacked probable cause to pull over the

RV he was driving, the stop was unconstitutional and the district court should have granted his

motion to suppress the evidence found in the RV. Because under Texas law driving on the shoulder

of the road is a traffic violation, the Texas state troopers had probable cause to pull over the RV.

The seizure was thus reasonable under the Fourth Amendment. *See Whren v. United States*, 517

U.S. 806, 809–10 (1996).

Texas law prohibits driving on the shoulder of the road except under certain exceptions that

are irrelevant here. *See* Tex. Transp. Code Ann. § 545.058(a). Two Texas state troopers testified

that, on May 13, 2008, they saw the RV cross the white fog line twice and thereby travel on the shoulder. The magistrate judge, with the benefit of demeanor evidence and high-quality video of the traffic stop, found that the officers were credible. This finding, adopted by the district court, supports a finding of probable cause for the traffic stop.

Barnett cites *United States v. Freeman*, 209 F.3d 464, 466 (6th Cir. 2000), to support his argument that probable cause did not exist. *Freeman* is easily distinguishable. *Freeman* held that when a large motor home weaved into the emergency lane for twenty or thirty feet, probable cause did not exist under Tennessee traffic laws. First, as a legal matter, *Freeman* considered probable cause under a Tennessee traffic law that required that a vehicle "shall be driven as nearly as practicable within a single lane." Tenn. Code Ann. § 55-8-123. The court stated "We can not . . . agree that one isolated incident of a large motor home partially weaving into the emergency lane for a few feet and an instant in time constitutes a failure to keep the vehicle within a single lane 'as nearly as practicable.'" *Id.* (quoting Tenn. Code Ann. § 55-8-123). The phrase "as nearly as practicable" limits when probable cause may be found under the Tennessee statute. The Texas law at issue in this case contains no similar limitation and thus grants Texas state troopers broader latitude under the Fourth Amendment. Second, as a factual matter, *Freeman* involved "an instant in time" and only twenty to thirty feet of driving on the shoulder on a windy day. In this case, on the other hand, Barnett crossed the line twice and there was no wind. Probable cause existed under Texas law to stop Barnett while he was driving the RV.

2. Flores-Delacruz's Evidentiary Arguments

Flores-Delacruz points to two evidentiary rulings by the district court that he argues were in error: the admission of Norman Lambridia's testimony and the admission of the receipt from Artech Auto Sales.

a. *The Testimony of Norman Lambridia*

Miller-Guerra made statements to Norman Lambridia, his partner in marijuana distribution, regarding Flores-Delacruz's role in the conspiracy. At trial, Lambridia introduced Miller-Guerra's statements against Flores-Delacruz.

Federal Rule of Evidence 801(d)(2)(E) provides that statements made by a "party's coconspirator during and in furtherance of the conspiracy" are not hearsay when offered against the party. The only question in this case is whether Miller-Guerra's statements to Lambridia were made "during and in furtherance of the conspiracy." Flores-Delacruz has not shown that the district court abused its discretion by admitting Lambridia's statements referring to him.

Flores-Delacruz argues that the district court should have made more specific findings about when Miller-Guerra's statements were made. He says that because the government's indictment charges that the events of the conspiracy took place only up to November 12, 2008, and because Flores-Delacruz was arrested in January 2009, these dates suggest the end points of when Miller-Guerra's statements could have been made during the conspiracy. Consistent with Flores-Delacruz's contention, the district court said that "at least some of [the statements by Miller-Guerra] appear to be made after the end date set forth in the Indictment." Trial Tr. 122–23, Jan. 20, 2010.

- 15 -

As a logical matter, Flores-Delacruz is mistaken about the relationship between the conspiracy's end date as set forth in the indictment and the conspiracy's end date for purposes of Rule 801(d)(2)(E). As we stated in *United States v. Blankenship*, 954 F.2d 1224, 1231 (6th Cir. 1992), "Statements of partners in a criminal joint venture are admissible even when a conspiracy has not been charged." Because 801(d)(2)(E) does not even require that a conspiracy be charged, it follows that the scope of the conspiracy for 801(d)(2)(E) is distinct from the indictment. Miller-Guerra was still on the run, so these statements could have been made during the conspiracy for 801(d)(2)(E) purposes even if it they were made after the indictment's alleged end date and even if Flores-Delacruz had been arrested.

Flores-Delacruz's argument is similar to the arguments made by the defendant in *United States v. Robinson*, 390 F.3d 853, 881–83 (6th Cir. 2004). In *Robinson*, the Government introduced statements by Robinson's coconspirators that were made after Robinson's arrest date and in geographic areas outside of the charged conspiracy. Robinson argued that his arrest marked the end date of his involvement in the conspiracy and that the territorial scope of the indictment limited the statements that could be considered in furtherance of the conspiracy. We held that even after arrest, a defendant is presumed to be a continuing member of the ongoing conspiracy and that, even if the indictment only referred to a conspiracy "in the Eastern District of Tennessee," this limitation in the indictment did not limit the scope of admissible evidence under 801(d)(2)(E). *Id.* As *Robinson* shows, an arrest or incarceration is not an affirmative, volitional act of withdrawal from the conspiracy and the scope of the indictment's charged conspiracy is not necessarily coterminous with

the scope of the conspiracy for purposes of 801(d)(2)(E). The district court sufficiently made

findings regarding the timing and context of Miller-Guerra's statements to Lambridia. Flores-

Delacruz has failed to show that the district court abused its discretion in allowing Lambridia's

testimony.

Relatedly, Flores-Delacruz argues that Lambridia's testimony violated the Confrontation

Clause and *Brady/Giglio* because the prosecution did not file notice that it intended to call Lambridia

until the middle of the trial. First, because statements by coconspirators are nontestimonial, the

Confrontation Clause challenge fails. *See United States v. Lopez-Medina*, 461 F.3d 724, 746 n.5 (6th

Cir. 2006). Second, even if the government failed to give notice until the middle of the trial, this is

not necessarily a *Brady/Giglio* violation. In *United States v. Farley*, 2 F.3d 645, 654 (6th Cir. 1993),

this court rejected a claim that disclosure of *Brady* materials at the close of the prosecution's case-in-

chief was untimely. The record here shows that the prosecution disclosed information such as

Lambridia's plea agreement, and that the defendants were able to use this information to cross-

examine Lambridia. Because the timing of the disclosure did not prejudice Flores-Delacruz's ability

to make effective use of the material at trial, Flores-Delacruz's *Brady/Giglio* argument fails. *See*

*United States v. Agurs*, 427 U.S. 97, 108 (1976).

Flores-Delacruz suggests that the prosecution chose not to disclose what Lambridia would

testify to for strategic reasons. But even if the prosecution employed such a stratagem, this alone

does not make a difference. The Supreme Court in *Brady v. Maryland*, 373 U.S. 83, 87 (1963), held

that the prosecutor's bad faith or good faith is irrelevant because the motivating principle is avoiding

an unfair trial for the accused, not punishing society for the prosecutor's misdeeds. That Flores-Delacruz cites no evidence, other than the timing of Lambridia's incarceration and the prosecution's decision to present Lambridia mid-trial, to support his bad-faith argument further shows the weakness of Flores-Delacruz's *Brady/Giglio* argument.

b. *Receipt from Artech Auto Sales*

Flores-Delacruz raises three arguments to support his contention that the receipt from Artech Auto Sales, which contained a reference to his address, should have been excluded. He contends that (1) the receipt contained inadmissible hearsay, (2) the receipt was irrelevant, and (3) its admission was unfairly prejudicial. Of these three, only the hearsay argument is adequately briefed. This argument fails and the relevancy and prejudice arguments can be summarily analyzed.

The receipt appears not to have been admitted for the truth of its contents and is therefore probably not hearsay. The receipt stated that Diana Rojas bought a car from Artech Auto Sales and listed Rojas's address as 809 Blue Jay Drive, Pharr, Texas. Other evidence showed that: (1) the Blue Jay Drive address was associated with Flores-Delacruz, (2) Rojas was Miller-Guerra's sister, and (3) Miller-Guerra frequented Artech Auto Sales. The prosecution was neither trying to prove that Rojas bought a car nor that she lived at Blue Jay Drive. Rather, the prosecution was trying to establish a link between Flores-Delacruz and members of the conspiracy to show they were associated, a purpose distinguishable from proving the truth of the statements in the documents. This court held in *United States v. Fowler*, 535 F.3d 408, 422 (6th Cir. 2008), that common documents in possession of conspirators are admissible to show that conspirators were associated,

a fact that was independent of the truth of the contents of the documents. It is true that the Artech Auto Sales receipt was not a common document held by multiple conspirators, but like the documents in *Fowler*, the receipt was admitted to show a connection among conspirators rather than to prove the truth of its contents.

However, even if a hearsay violation occurred, Flores-Delacruz's failure to object on hearsay grounds in the district court means that this court will only reverse if the admission of the receipt was plain error. *See* Fed. R. Crim. Proc. 52(b); *see also United States v. Evans*, 883 F.2d 496, 499 (6th Cir. 1989) (describing plain error standard for evidentiary error). The receipt added little to the evidence against Flores-Delacruz, which was independently sufficient to find him guilty. Flores-Delacruz was caught leaving Huerta's residence in a car with Miller-Guerra, $21,000, and a fake identification with a picture of Huerta and the name "James Loya." Physical evidence of wire transfers combined with Colunga's testimony suggested that Colunga paid Flores-Delacruz for marijuana. Lambridia's testimony suggested that Flores-Delacruz transported drugs and money across the Mexican border. Flores-Delacruz was listed in drug ledgers and, when arrested, possessed notes that appeared to be drug ledgers. Based on the totality of the evidence, the admission of the receipt was not prejudicial and did not affect Flores-Delacruz's substantial rights. As the Supreme Court reaffirmed in *United States v. Marcus*, 180 S. Ct. 2159, 2164–65 (2010), in the ordinary case when arguing that a plain error occurred, a defendant-appellant must show that there is a reasonable probability that the error affected the outcome of the trial. Flores-Delacruz has not shown that the receipt was in any way determinative of the outcome of the trial. Thus, even if the receipt

constituted hearsay, he has not shown that the district court's decision to admit the receipt constituted plain error.

The district court did not abuse its discretion in overruling Flores-Delacruz's relevancy and prejudice objections. The receipt had at least some tendency to make the fact of a connection between alleged conspirators more likely. The district court also did not err in balancing the probative value with the dangers of unfair prejudice, misleading the jury, or confusing the issues. At this stage Flores-Delacruz must show that the dangers "substantially" outweigh the probative value, Fed. R. Evid. 403, and that the district court abused its "very broad discretion" in making such a determination. *United States v. Mack*, 258 F.3d 548, 555 (6th Cir. 2001). Flores-Delacruz has not identified anything of the sort.

### 3. Hernandez's Motion to Suppress

Hernandez argues that the search warrant authorizing the search of his residence was invalid because it was not supported by probable cause. He argues that the evidence in Agent Templeton's affidavit was unreliable, stale, and failed to sufficiently connect Hernandez's residence with the allegation of illegal activity. All three of these arguments failed at the district court, and all three fare no better here.

The July 3, 2008 affidavit stated that in May 2008, law enforcement agents spoke with a confidential informant who provided information about trafficking by Jose Colunga which involved Hernandez. Lending credibility to the informant's testimony, Colunga's activity was corroborated by surveillance. In addition, the informant provided a copy of a photo which showed Hernandez

holding approximately $8000 wrapped in rubber bands.  Law enforcement officers had previously

encountered Hernandez on August 9, 2007—the first traffic stop described in this opinion, *see supra*

Section I.A.—when they found him in a car with Huerta, $1400, and a handgun with ammunition.

Based upon the evidence in this affidavit, there was probable cause to support the issuance

of the warrant.  The informant's statement was supported by some corroboration as well as officers'

previous encounter with Hernandez.  This is sufficient to meet the reliability requirement of probable

cause when a confidential informant is involved.  *See Illinois v. Gates*, 462 U.S. 213, 230 (1983).

Taking into account the character of the crime, the criminal, the thing to be seized, and the place to

be searched, *United States v. Hammond*, 351 F.3d 765, 772 (6th Cir. 2003), the information in the

affidavit was not stale.  The affidavit alleged ongoing marijuana trafficking tied to a number of

residences, including Hernandez's.  This type of activity is still fresh within a few months of an

informant's statement.   In *Hammond*, we held that a five-month-old tip was not stale when the

alleged drug trafficking was ongoing, the drugs were likely to be there for an indefinite amount of

time, and the location was an established and secure operational base.  *Id.*  Similarly, in this case,

the factors all point away from finding the tip stale. Hernandez's argument about the nexus between

his alleged crime and his residence simply fails to take into account the commonsense fact accepted

by courts across the country that drug dealing creates an almost inherent nexus between the dealer's

home and the alleged crime.  As we explained in *United States v. Jones*, 159 F.3d 969, 975 (6th Cir.

1998) (quoting *United States v. Lamon*, 930 F.2d 1183, 1188 (7th Cir. 1991)), "In the case of drug

dealers, evidence is likely to be found where the dealers live." We have no difficulty in affirming the district court's denial of Hernandez's motion to suppress.

## B. *Sufficiency of the Evidence*

All of the defendants-appellants except Huerta raise sufficiency-of-the-evidence arguments based on denials of Rule 29 motions for acquittal. Because the evidence before the jury was sufficient to support convictions against each defendant, these arguments are unsuccessful.

When considering a challenge to the sufficiency of the evidence, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).

21 U.S.C. § 841(a)(1) makes it unlawful for any person to knowingly or intentionally "manufacture, distribute, or dispense, or possess with intent to manufacture, or distribute, or dispense, a controlled substance." 21 U.S.C. § 846 makes it clear that conspiracy and attempt result in the same penalty as the underlying offense. Here on appeal, the question for each appellant-defendant is whether any rational jury could look at the admitted evidence and find him guilty of 28 U.S.C. §§ 841(a)(1), 846.

### 1. Blake-Saldivar (conspiracy to distribute and possess with intent to distribute at least one hundred kilograms of marijuana)

In Blake-Saldivar's case, Tina Porter and Melody Bailey each testified that Blake-Saldivar distributed marijuana, a controlled substance. This is sufficient to satisfy the physical-act element of the crime. The "knowingly or intentionally" element of the crime is satisfied by the fact that

Blake-Saldivar accepted cash and other forms of payment and engaged in deliveries on multiple occasions.

Blake-Saldivar argues that the coconspirators could not tie him directly to the crime of conspiracy and that there was confusion about whether "Rudy" and Blake-Saldivar were the same person. The second argument is contradicted by Bailey's identification of "Rudy" as Blake-Saldivar in open court. *See* Trial Tr. 118–119, Jan. 13, 2010. Even if neither Melody Bailey nor Tina Porter personally saw Blake-Saldivar carrying drugs, they were each in a position to rationally conclude that Blake-Saldivar was the source of the marijuana that arrived at their homes because, as Porter said, "shortly after he came, and there were no other visitors to the home, there was marijuana there that was not there before." Trial Tr., 30, Jan 19, 2010. The Western Union transfers of $2500 and $3000 from Porter to Blake-Saldivar further corroborate the trial testimony. Upon the record as a whole, substantial and competent evidence supports the jury's finding of Blake-Saldivar's guilt.

  2.  Barnett (conspiracy to distribute and possess with intent to distribute at least one thousand
      kilograms of marijuana; conspiracy to manufacture over one thousand marijuana plants)

Barnett's sufficiency-of-the-evidence argument assumes the court will agree with his suppression argument. Barnett confuses the relationship between a sufficiency-of-the-evidence argument and an argument of evidentiary error because even wrongly admitted evidence must be taken into account by a court reviewing for sufficiency of the evidence. *United States v. Quinn*, 901 F.2d 522, 530–31 (6th Cir. 1990) (citing *Lockhart v. Nelson*, 488 U.S. 33, 40 (1988)). There can be no doubt that the evidence was sufficient to find Barnett guilty of conspiracy to distribute when he was caught on one of his multiple drug runs with approximately six hundred pounds of marijuana

"more or less in plain view."  Report and Recommendation Regarding Barnett's Mot. to Suppress

Evidence (Doc. 432), 5, Nov. 10, 2009.

Barnett's better argument challenges the sufficiency of his knowledge regarding the

conspiracy to manufacture marijuana.  But this argument fails because the circumstantial evidence

suggesting Barnett's knowledge of the Pisgah National Forest marijuana production was sufficient.

Circumstantial evidence may be sufficient to convict.  *See Holland v. United States*, 348 U.S. 121,

140 (1954).  Barnett knew that his coconspirators were involved in the large-scale distribution of

marijuana.  Barnett also likely would have known that in places like the Tennessee/North Carolina

border, marijuana is grown on park land.  In addition, the fact that Barnett was being paid $2000 to

drive a van into a nearby forest and pick up three unknown men suggests that something nefarious

was at play.  The jury appears not to have believed Barnett's argument that he was unaware of his

role in the manufacturing of marijuana for distribution.  Because a rational trier of fact could find

the elements of both conspiracy to distribute and conspiracy to manufacture were met by the

evidence, the district court properly rejected Barnett's Rule 29 motion.

3.  Flores-Delacruz (conspiracy to distribute and possess with intent to distribute
at least one thousand kilograms of marijuana)

A rational jury could also have found Flores-Delacruz guilty.  Among other evidence, the

following was presented against Flores-Delacruz:  (1) he was with Miller-Guerra in a car that was

leaving Huerta's residence in Johnson City and which contained $21,000—at this time, Flores-

Delacruz possessed an identification with a picture of Huerta and the name "James Loya," which was

a name used for documentation such as Western Union transfers; (2) one Western Union transfer

suggested a payment from Jose Colunga to Flores-Delacruz, and Colunga testified that he wired money to his marijuana suppliers; (3) Lambridia testified that Miller-Guerra's brother-in-law in McAllen, Texas transported drugs and money across the Mexican border (Flores-Delacruz was Miller-Guerra's brother-in-law and lived in Pharr, Texas, which is directly adjacent to McAllen, Texas); (4) notebooks appearing to be drug ledgers named Flores-Delacruz; and (5) when arrested, Flores-Delacruz possessed notes that appeared to be drug ledgers.

Taken together, this evidence supports a rational finding of guilt beyond a reasonable doubt. Flores-Delacruz argues that because the overwhelming mass of evidence does not implicate him, the evidence was insufficient. However, even if the bulk of the evidence was focused on the criminal activity of others, this does not imply that Flores-Delacruz was innocent. The Supreme Court has held that even the uncorroborated testimony of accomplices may support a conviction. *See Caminetti v. United States*, 242 U.S. 470, 495 (1917). The evidence against Flores-Delacruz included the testimony of accomplices in addition to physical evidence. Sufficient evidence exists to find Flores-Delacruz guilty of conspiracy to distribute.

### 4. Hernandez (conspiracy to distribute and possess with intent to distribute at least one hundred kilograms of marijuana)

Hernandez's sufficiency-of-the-evidence argument also fails. Not only could a rational trier of fact have found him guilty of conspiracy to distribute one hundred kilograms or more of marijuana, but it is hard to come to any other conclusion. Hernandez's residence contained paraphernalia indicating trafficking, and his codefendants repeatedly implicated him in the conspiracy. Hernandez's best argument is that he may have been a drug dealer and may have been

friends with those in the conspiracy, but that he was not a member because he did not agree to participate in a group activity. In short, he claims he was more of an independent contractor than a partner in the conspiracy. However, Hernandez was involved with Huerta and the Colungas for years and the prosecution certainly put forth evidence that supports the jury's finding that he was a part of the conspiracy.

## C. *Mistrial Arguments*

In the two instances where mistrial is argued here on appeal, prejudice has not been shown and the district court did not abuse its discretion by denying the motions for mistrial. This conclusion is supported by our analysis in *United States v. Solorio*, 337 F.3d 580, 592–94 (6th Cir. 2003).

### 1. Blake-Saldivar's Sequestration Argument

As summarized above in subsection I.B.1, Blake-Saldivar argues that because codefendants shared a holding cell and communicated to some extent, a mistrial was required.

As an initial matter, Blake-Saldivar has not pointed to a sequestration order by the court. In addition, it is not a Rule 615 violation to hold witnesses together. Witnesses who are not detained are routinely asked to wait together in a witness room. Further, even if a sequestration order has been violated, this does not automatically bar a witness's testimony. *Solorio*, 337 F.3d at 593. To determine whether the violation of a sequestration order warrants exclusion, this court looks to whether "particular circumstances" exist, "such as where a witness violates the order with the

'consent, connivance, procurement, or knowledge' of the party seeking his testimony." *Id.* (quoting

*United States v. Gibson*, 675 F.2d 825, 836 (6th Cir. 1982)).

There is no evidence that the prosecution engaged in anything of this sort at trial. The district

court found that at most there was a "minor technical violation" of Rule 615 and that no defendant

had alleged, much less proven, any resulting prejudice. Denying Blake-Saldivar's motion for

mistrial was not an abuse of the district court's discretion.

2.  Huerta's Evidence Arguments

Huerta argues that a mistrial was required because of testimony by officers that referred to

Huerta's earlier firearm charge and because of testimony by Agent Davis that repeated Barnett's

statements referring to Huerta.

Huerta has not shown prejudice. First, it is hard to see how the references to his earlier

firearms charge could have had any unfair effect leading to his conviction for conspiracy to traffic

marijuana. This is true not only because the firearm found during the August 9, 2007 arrest does not

appear to have had anything to do with marijuana, but also because the jury acquitted Huerta of the

firearms charge in the present case. This shows that the jury was able to set aside any prejudice

resulting from the remarks of the officers about Huerta and firearms. Second, even if the admission

of Agent Davis's testimony was a violation of *Bruton v. United States*, 391 U.S. 123 (1968), any

error would have been harmless when considered against the large body of evidence supporting the

jury's finding that Huerta was heavily involved in the conspiracy. The district court did not err in

denying Huerta's motion for a mistrial.

### D. *Flores-Delacruz's Jury Instructions Argument*

Flores-Delacruz points to problems with the district court's jury instructions regarding dual fact and opinion testimony. Based on the facts of this case, any error was harmless. The jury was otherwise instructed properly, was given access to items that were alleged to be drug ledgers, and was often exposed to testimony by the officers that distinguished between facts and opinions.

At trial, prosecution witnesses provided a combination of fact and opinion testimony. Flores-Delacruz did not object to the jury instructions at trial, but here argues that the district court's failure to instruct the jury regarding the prosecution witnesses' dual roles as fact and opinion witnesses was plain error justifying the reversal of his conviction.

The trial court gave general instructions about how to weigh evidence as well as Pattern Jury Instruction 7.03. In giving Pattern Jury Instruction 7.03, the trial court said:

> You have heard the testimony of chemist Sharla McCloskey, FBI Agent David Hoover and DEA Agent Michael Templeton who testified as opinion witnesses. You do not have to accept the opinion of these witnesses. In deciding how much weight to give their opinion, you should consider the witness' qualifications and how he or she reached his or her conclusions. Also consider the other factors discussed in these instructions for determining the credibility of witnesses.

Trial Tr., 12, Jan. 29, 2010.

As this shows, the court specifically referred to Agent Templeton as someone giving opinion testimony. However, the two other law-enforcement officers that testified regarding evidence against Flores-Delacruz (DEA Special Agent Donald Stuart Hurst and Washington County Sheriff's Department Lieutenant William Douglas Gregg) were not mentioned in this instruction, and no

specific instruction about dual fact and opinion testimony (e.g., Pattern Jury Instruction 7.03A) was given.

The testimony of the law-enforcement officers in this case contained a combination of opinion testimony that was clearly demarcated and opinion testimony that could have more easily been confused for factual statements. *Compare, e.g.*, Trial Tr., 137, Jan. 21, 2010 ("Q: *Do you have an opinion* as to what this document is? A: Yes, I do. Q: And what is that? A: It's a drug ledger for marijuana.") (testimony of Agent Templeton) (emphasis added), *with id.* at 216 ("Q: And can you talk about this page? A: That's a marijuana drug ledger.") (testimony of Agent Templeton).

However, any error was harmless because the jury was given access to the alleged drug ledgers and thorough general instructions about how to weigh evidence. In addition, enough statements by the law-enforcement officers were prefaced with phrases like "it appears to be. . ." that a reasonable jury would understand the testimony of the officers to be less than infallible fact. Even if the district court did not instruct the jury as clearly as it could have regarding the dual fact and opinion nature of the officers' testimony, in this case, the alleged error was harmless.

This case is similar to *United States v. Vasquez*, 560 F.3d 461, 470–71 (6th Cir. 2009). In *Vasquez*, the trial judge failed to give a cautionary instruction regarding a law-enforcement officer's dual role as fact and expert witness, but no other evidentiary errors occurred, ample evidence existed to support the defendant's convictions, and the trial judge gave general instructions on how the jury should weigh evidence. We held that the error was harmless and distinguished *United States v. Lopez-Medina*, 461 F.3d 724, 742–45 (6th Cir. 2006), a case in which we found plain error. The

holding in *Lopez-Medina* was based on the trial court's failure to give an instruction on how to weigh expert testimony (e.g., Pattern Jury Instruction 7.03) and on the lack of clear demarcation between expert and fact witness roles in the agents' testimony. In this case, an expert witness instruction was given and demarcation issues are not present to the same degree found in *Lopez-Medina*. As in *Vasquez*, the alleged error was harmless.

### E. *Sentencing Challenges*

Barnett and Huerta each challenge a firearm enhancement to their sentencing-guidelines calculations. Section 2D1.1(b)(1) of the United States Sentencing Guidelines provides for a two-level enhancement "[i]f a dangerous weapon (including a firearm) was possessed" in connection with a drug trafficking offense.

### 1. Barnett's Firearm Enhancement

The district court found that Barnett constructively possessed the .45-caliber pistol that was in the pocket of one of the bags holding freshly cut marijuana when he was transporting the three men out of Pisgah National Forest. Barnett argues that the issue should have been submitted to a jury and that the evidence against him was not sufficient because he claims to have had no knowledge of the handgun. Barnett's sentence of 240 months was dictated by the mandatory minimums, not the firearm enhancement. Barnett argued at his sentencing hearing that the enhancement would affect his "classification," Sentencing Hr'g Tr., 4, Aug. 16, 2010, and the district court addressed the objection to the firearm enhancement "because it might in fact affect Mr. Barnett's classification within the Bureau of Prisons, or his eligibility for various programs and/or

sentencing credits from the Bureau of Prisons." *Id.* at 12. Barnett does not elaborate on any classification issues on appeal.

Because Barnett's sentence was dictated by the mandatory minimum rather than the enhancement, it is unclear whether we may properly consider Barnett's challenge to his sentencing enhancement. *See*, *e.g., United States v. Scruggs*, 436 Fed. App'x 617, 620 (6th Cir. 2011). But even if we were to consider the merits of Barnett's challenge to the enhancement, we would uphold the enhancement. First, there is no problem with a judge making factual determinations by a preponderance of the evidence during sentencing as long as it does not "expose the defendant to a greater punishment than that authorized by the jury's guilty verdict." *Apprendi v. New Jersey*, 530 U.S. 466, 494 (2000); *see also United States v. Stone*, 432 F.3d 651, 654–55 (6th Cir. 2005). Second, the enhancement was properly applied if the weapon was present and if it was probable that the weapon was connected with the offense. U.S.S.G. § 2D1.1 cmt. n.3; *United States v. Moses*, 289 F.3d 847, 850 (6th Cir. 2002). Third, it is reasonably foreseeable that coconspirators will possess a firearm when massive amounts of drugs are involved. *See Woods*, 604 F.3d at 291 (collecting cases). It was not clearly erroneous for the district court to find by a preponderance of the evidence that Barnett either constructively possessed the .45-caliber pistol by having it in his van or knew it was reasonably probable that his coconspirator would be armed. Barnett may claim ignorance of the firearm and the purpose of his trip to Pisgah National Forest, but this is a factual question and, reviewing the entire evidence, the court is not "left with the definite and firm conviction that a

mistake has been committed." *United States v. Wheaton*, 517 F.3d 350, 367 (6th Cir. 2008) (stating the standard of review).

### 2. Huerta's Firearm Enhancement

Huerta argues that the testimony supporting his firearm enhancement was not credible and that because Bradford's testimony regarding the Sig nine-millimeter was not mentioned in Huerta's presentence report, it should not have been considered by the district court.

There was no clear error. Even if Bennett, the primary witness connecting Huerta to the shotgun and nine-millimeter handgun, was not the most credible witness, his testimony was supported by the physical evidence of the guns that were found buried at 750 Georgia Street. We are not left with a definite and firm conviction that an error has occurred and, thus, the district court did not abuse its discretion in finding that Huerta possessed a firearm during the drug-trafficking offense. Because the combination of Bennett's testimony and the physical evidence was sufficient, it is not necessary to address Huerta's argument regarding whether the district court could rely on Bradford's testimony regarding the Sig nine-millimeter handgun to support an enhancement.

### III. CONCLUSION

For the foregoing reasons, the district court's judgments are affirmed.